UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAUL MARCELO CUZCO,

                          Plaintiff,

                                                    Class Action

              v.
                                                    Case No. 06-CV-2789
ORION BUILDERS, INC. and JAN KVAS,                  (SCR)(LMS)

                          Defendants


MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

WORKERS' RIGHTS LAW CENTER
        OF NEW YORK, INC.
101 Hurley Ave., Suite 5
Kingston, NY  12401

ATTORNEYS FOR PLAINTIFFS

## <u>TABLE OF CONTENTS</u>

*Table of Authorities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *ii*

I.      Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Allegations in the First Amended Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      Material Undisputed Facts Relevant to Plaintiffs' Substantive
                Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.     Standard of Review for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V.      Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Defendants Employed the Plaintiffs and Other Class Members
                Within the Meaning of the FLSA and NYLL. . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      Defendants Failed to Pay Plaintiffs Overtime, as Required by
                the FLSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.      Defendants Failed to Pay Plaintiffs the Minimum Wage, Without
                Improper Deductions, as Required by Federal Law. . . . . . . . . . . . . . . . . . . . . 9

        D.      Defendants Violated the Minimum Wage, Overtime, Timely Payment
                of Wages, and the Spread of Hours Provisions of New York Labor Law . . . . . . 12

        E.      The Current Plaintiffs are Entitled to Summary Judgment on
                Damages; and an Inquest Should Be Held on Class Damages. . . . . . . . . . . . . . 14

VI.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

### *Cases*

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 15

Arriaga v. Fla. Pac. Farms, LLC, 305 F.3d 1228 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 10

Barrentine v. Arkansas-Best Freight Sys., 450 U.S. 728,
101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Barry v. Atkinson, Case No. 96 Civ. 8436,
1999 U.S. Dist. LEXIS 12294 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S. Ct. 895,
89 L. Ed. 1296 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Biggs v. Wilson, 1 F.3d 1537 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Brothwick v. First Georgetown Sec., Inc., 892 F.2d 178 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . 6

Calloway v. Marvel Entertainment Group, Div. of Cadence Industries Corp.,
110 F.R.D. 45, 52 (S.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8n5

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) . . . . . . . . . . 6

Cuzco v. Orion Builders, Inc., 477 F. Supp. 2d 628 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . 2

Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54 (2d Cir. 1987) . . . . . . . . . . . . . 6

Fabry's S.r.L. v. IFT Int'l, Inc., Case No. 02 Civ. 9855,
2003 U.S. Dist. LEXIS 8597 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IKEA U.S. v. Industrial Bd. of Appeals, 660 N.Y.S.2d 585 (App. Div. 1997) . . . . . . . . . . . . . 13

Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350 (11th Cir. 1982) . . . . . . . . . . . . . . . 11

Manning v. New York Univ., Case No. 98 Civ. 3300,
2001 U.S. Dist. LEXIS 12697 (S.D.N.Y. August 22, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Margo v. Weiss, 213 F.3d 55 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9n5

Matter of Angello v. Labor Ready, Inc., 859 N.E.2d 480 (NY 2006) . . . . . . . . . . . . . . . . . . . . 13

McClellan v. Smith, 439 F.3d 137 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

McCoy Assocs. v. Nulux, Inc., 218 F. Supp. 2d 286 (S.D.N.Y. 2002) . . . . . . . . . . . . . . 21, 21n5

Mumbower v. Callicott, 526 F.2d 1183 (8th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

People by Mitchell v. Interborough Rapid Transit Co., 154 N.Y.S. 627 (App. Div. 1915) . . . . 13

Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 6

Qatar Nat'l Navigation & Transp. Co. v. Citibank, N.A., Case No. 89 Civ. 464,
1996 U.S. Dist. LEXIS 15424 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8n5

Reich v. Southern New England Telcoms. Corp., 121 F.3d 58 (2d Cir. 1997) . . . . . . . . . . . . . 19

Rogers v. City of Troy, 148 F.3d 52 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11, 11n7

Trebor Sportswear Co. v. The Ltd. Stores, Inc., 865 F.2d 506 (2d Cir. 1989) . . . . . . . . . . . . . . 6

Walton v. United Consumers Club, Inc., 786 F.2d 303 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . 11

Yang v. ACBL Corp., 427 F. Supp. 2d 327 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 14-16

Zeng Liu v. Jen Chu Fashion Corp., Case No. 00 Civ. 4221,
2004 U.S. Dist. LEXIS 35 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## *Statutes and Rules*

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

29 C.F.R. § 531.3(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 C.F.R. § 790.21(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

29 C.F.R. §§ 778.108 - 110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

New York Labor Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

12 NYCRR §142-2.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

12 NYCRR § 142-2.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

NY C.P.L.R. § 5004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I.      Preliminary Statement

Plaintiffs SAUL MARCELO CUZCO ("Plaintiff Cuzco"), CLAUDIO FIGUEROA ("Plaintiff Figueroa"), and BOLIVAR GUIRACOCHA ("Plaintiff Guiracocha") (collectively, "the current Plaintiffs") on behalf of themselves and other members of the putative plaintiff class[1], move for partial summary judgment pursuant to Fed. R. Civ. P. 56 against Defendants in the instant case.  Plaintiffs and other similarly situated frequently worked more than 40 hours per week without being paid overtime premiums, routinely worked over ten hours a day but were not paid spread of hours wages, and were required to leave a security deposit equal to one month's wages and to purchase their own tools of the trade, bringing their weekly wages below the federal and state minimum.  Defendants have admitted each of these allegations.  Therefore, no genuine issues of material fact remain which would necessitate a trial to establish Defendants' liability for violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

The current Plaintiffs are also entitled to summary judgment on damages, as their damages can be ascertained based on payroll records provided by the Defendants in discovery, bank records provided by way of subpoenas, and the current Plaintiffs' declarations.  Therefore, no genuine issues of material fact exist as to the current Plaintiffs' damages.  The Plaintiffs also respectfully request an inquest on the putative class members' damages.  Finally, Plaintiffs seek an award of pre-judgment interest from the date final judgment is entered in this case.

---

[1] Plaintiffs have filed a Motion for Class Certification concurrently with the instant motion.  Plaintiffs therefore move for class-wide summary judgment on liability on the presumption that the class certification motion will be granted.  If the class certification motion is denied, Plaintiffs respectfully request that the Court consider this motion only insofar as it pertains to the current Plaintiffs.

II.     Procedural History

Plaintiff  Cuzco's initial Complaint was filed against Orion Builders, Inc. and Jan Kvas on April 7, 2006.  (CM/ECF Doc. No. 2).  Plaintiff Cuzco alleged violations of the FLSA and New York Labor Law.  Plaintiff Cuzco brought his FLSA claims on behalf of himself and other similarly situated workers.

On July 25, 2007, Plaintiff Cuzco filed a Motion to Proceed as a Representative Action, for Court-Authorized Notice, and for the Disclosure of the Names and Addresses of Potential Opt-in Plaintiffs ("representative action motion").  (CM/ECF Doc. No. 12).  On November 20, 2006, while the representative action motion was pending before the Court, Plaintiff Cuzco submitted a letter brief seeking leave to file an amended complaint that, *inter alia*, added Rule 23 class claims.

On March 8, 2007, following oral argument and supplemental briefing, the Court issued a Memorandum Decision and Order granting Plaintiff Cuzco's representative action motion and his motion for leave to amend the complaint.  See Cuzco v. Orion Builders, Inc., 477 F. Supp. 2d 628 (S.D.N.Y. 2007) (CM/ECF Doc. No. 35) ("representative action order").  Plaintiff Cuzco therefore filed his First Amended Complaint ("Am. Compl."), which included the Rule 23 class claims, on March 16, 2007.  (CM/ECF Doc. No 36).

Since the Court issued the representative action order, two additional workers, Claudio Figueroa and Bolivar Guiracocha, have opted into the action to date.  (CM/ECF Doc. No. 43 and 49).  Still, Plaintiffs expect more workers will join the action before the opt-in period expires.

The Court set the briefing schedule for the instant motion during the parties' May 25, 2007 appearance.  The filing deadlines were extended on Plaintiffs' consent motion by this Court's October 5, 2007 Amended Scheduling Order.  (CM/ECF Doc. No. 48).  As set forth in

the Court's Amended Scheduling Order, Plaintiffs are also filing their Rule 23 class certification motion concurrently with the instant motion.

III.    Statement of Facts

    A.    Allegations in the First Amended Complaint

In the operative Amended Complaint, Plaintiffs allege they were employed by Defendants' construction business on one or more occasions between on or about September 1, 2002 and on or about September 1, 2005.  Am. Compl. at ¶ 9).

Plaintiffs also allege they were manual laborers and employees of Defendants within the meaning of the FLSA and New York Labor Law (Am. Compl. at ¶¶10-12), and that Defendants violated their right to overtime premiums and their right to earn a minimum wage without improper deductions as set forth in the FLSA and New York Labor Law.  (Am. Compl. at ¶¶60-62, 67-68.)  Furthermore, Plaintiffs claim that Defendants violated their rights under the spread of hours and timely payment of wages provision of New York Labor Law.  (Am. Compl. at ¶¶69-70.)

    B.    Material Undisputed Facts Relevant to Plaintiffs' Substantive Law Claims

At all relevant times, Defendants operated a construction business, primarily framing houses but also sometimes building decks or staircases.  (Pls' Statement of Undisputed Facts ("Pl. SUF") at ¶ 1; Oct. 23-24, 2006 Dep. of Jan Kvas ("10/2006 Kvas Dep.") at 282:5-18, 293:4-13, Oct. 26, 2007 Decl. of Daniel Werner ("Werner Decl.") at ¶3, Ex. A; Sept. 22, 2006 Decl. of Jan  Kvas ("9/2006 Kvas Decl.") at ¶7, Werner Decl. at ¶3, Ex. B).
Plaintiffs worked for Defendants at construction sites where Defendants were contracted work by other contractors, or by builders.  Plaintiffs were paid between $8.50  and $14.00 per hour for their work, which primarily consisted of cutting and nailing wood.  (Pl. SUF at ¶ 13-19; Oct. 26,

2007 Decl. of Diana Vazquez ("Vazquez Decl.") at ¶¶ 9, Ex. B, 10, 11, Ex. D, 12, Ex. E; Oct. 25, 2007 Decl. of Saul Marcelo Cuzco ("10/2007 Cuzco Decl.") at ¶ 6; 10/2006 Kvas Dep. at 99:4-19, 119:8-15; 9/2006 Kvas Decl. ¶10; Sept. 24, 2007 Stip. ("9/2007 Stip.") at ¶ 2, Werner Decl. at ¶ 3, Ex. C).

When working for Defendants at their construction sites, workers sometimes worked over 40 hours in a single workweek. (Pl. SUF at ¶¶ 28, 31, 34, and 37; Vazquez Decl. at ¶¶ 9, Ex. B, 12, Ex. E, 13, Ex. F, 15, 17, 19 and 21; Oct. 25, 2007 Decl. of Claudio Figueroa ("Figueroa Decl.") at ¶ 5; Oct. 25, 2007 Decl. of Bolivar Guiracocha ("Guiracocha Decl.") at ¶ 5; 10/2006 Kvas Dep. at 116:12-19, 118:20-24).  The spread of hours between the workers' starting time and finishing time also often exceeded ten hours in a day.  (Pl. SUF at ¶¶ 39-40, 44; Vazquez Decl. at ¶¶ 9, Ex. B, 13, Ex. F, 22-23 and 26; 10/2006 Kvas Dep. at 120:10-24, 121:8-122:9, 262:15-24, 263:2-18).  Moreover, Plaintiffs were required to purchase some tools of the trade as a condition of employment.  (Pl. SUF at ¶¶ 20-21; 10/2007 Cuzco Decl. at ¶ 2; Guiracocha Decl. at ¶ 7; Figueroa Decl. at ¶ 7).  All of Defendants' employees were required to own hand tools, a circular saw, and a sawsall.  (Pl. SUF at ¶ 27; Nov. 22, 2006 Decl. of Jan Kvas ("11/2006 Kvas Decl.") at ¶ 3, Werner Decl at ¶ 3, Ex. G).

Regardless of the number of hours worked in a week, Defendants paid a flat hourly rate to their workers.  (Pl. SUF at ¶¶ 29, 32, 35, and 38; 10/2007 Cuzco Decl. at ¶ 8; 10/2006 Kvas Dep. at 118:25 - 119:15 Figueroa Decl. at ¶¶ 6; Guiracocha Decl. at ¶¶ 6)  Likewise, workers did not receive an extra hour of pay at the state minimum wage when the spread of hours from the time they started work to the time they finished exceeded 10 hours. (Pl. SUF at ¶¶ 41 and 45; 10/1007 Cuzco Decl. at ¶ 9; Guiracocha Decl. at ¶ 11; 10/2006 Kvas Dep. at 120:10-24, 121:8-122:9,  262:15-24, 263:2-18)

The first day of the pay period established by Defendants was, at the earliest, approximately four weeks prior to the date workers were paid.  (Pl. SUF at ¶¶ 47 - 49;  10/2006 Kvas Dep. at 240:11-18, 242:11 - 243:4; 7/2006 Cuzco Decl. at ¶6; Vazquez Decl. at ¶ 28).  That pay period concluded approximately two weeks prior to the date the workers were paid.  (Pl. SUF at ¶ 47-49; 10/2006 Kvas Dep. at 240:11-18, 242:11 - 243:4; 7/2006 Cuzco Decl. at ¶6; Vazquez Decl. at ¶ 28).  As a result, Plaintiffs were not paid at all until they had worked for the Defendant for at least 30 days.[2]  (Pl. SUF at ¶¶ 48 - 49; 10/2006 Kvas Dep. at 240:11-18, 242:11 - 243:4; 7/2006 Cuzco Decl. at ¶6).  Moreover, workers were not always paid every two weeks, and sometimes had to wait to get paid.  (Pl. SUF at ¶ 52; 10/2006 Kvas Dep. at 241:6-19.)  Workers were sometimes paid by Defendants with checks that were returned for insufficient funds. (Pl. SUF at ¶ 52; Kvas Dep. 2 at 244:14-17.)  Finally, Defendants did not pay Plaintiff Cuzco for approximately 125 hours of work he did in 2005, and only issued what Defendants contend was full payment over one year later.  (Pl. SUF at ¶ 53; 10/2007 Cuzco Decl. at ¶¶ 10-11; 9/2006 Kvas Decl. at ¶14.)

---

[2]  Plaintiff Figueroa was not paid until 28 days after his *last* day of work.  (Pl. SUF at ¶ 50; Figueroa Decl. at ¶10; Vazquez Decl. at ¶ 29).  Likewise, Plaintiff Guiracocha was not paid for his last week of work until over one month after his last day of work.  (Pl. SUF at ¶ 51; Guiracocha Decl. at ¶ 10; Vazquez Decl. at ¶ 30).

IV.    Standard of Review for Summary Judgment

Summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of informing the Court of those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006); Trebor Sportswear Co. v. The Ltd. Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989). Once the moving party has come forward with support – including pleadings, depositions, interrogatory answers, and affidavits – demonstrating that no genuine issue of material fact remains to be tried, the burden shifts to the non-moving party to provide similar support setting forth specific facts about which a genuine triable issue remains. See Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004); Brothwick v. First Georgetown Sec., Inc., 892 F.2d 178, 181 (2d Cir. 1989); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir. 1987); . If the court determines that there is a not a genuine issue of material fact, and that the moving party prevails as a matter of law, then summary judgment is proper. See Celotex, 477 U.S. at 322; Powell, 364 F.3d at 84.

V.      Argument

      A.      Defendants Employed the Plaintiffs and Other Class Members Within the

              Meaning of the FLSA and NYLL.

The FLSA defines an "employee" as "any individual employed by an employer."  FLSA,

29 U.S.C. § 203(e)(1).  Likewise, "'employ' includes to suffer or permit to work."  FLSA, 29

U.S.C. § 203(g).  New York Labor Law adopts a nearly identical definition of "employee."  See

NY Labor Law §§ 190(2) and 651(5).

In a recent Stipulation, Defendants conceded that "[t]he Plaintiff[3] was the Defendants'

employee at various times relevant to this civil action and never an independent contractor." (

9/2007 Stip. at ¶ 1.  If Defendants employed Plaintiff Cuzco, they necessarily employed all of

their workers.  In a supplemental declaration Defendants submitted as part of their representative

action motion opposition papers, foreman Zaza Khvedelidze stated,

> the relationship between [Defendant Jan] Kvas, myself and other framing
> carpenters that were contracted to work for Mr. Kvas, the tools used and working
> conditions were generally the same...
>
> Myself (as a carpenter) and all other workers who worked for Mr. Kvas worked
> under almost identical conditions. Among the workers, on several projects were
> for example Mr. Saul Marcelo Cuzco and his brother Mr. Marco Cuzco.

(Nov. 9, 2006 Decl. of Zaza Khvedelidze ("Khvedelidze Decl.") at ¶¶ 8 and 18, Werner Decl. at

¶ 3, Ex. E; Pl. SUF at ¶ 5).

_____

    [3] This Stipulation, which was drafted by Defense counsel, indicated that "Plaintiff" was
the Defendants' employee, although at the time the Stipulation was executed, opt-in Plaintiff
Figueroa had already joined the case.  Regardless of whether the Defendants intended the
stipulation to extend solely to Plaintiff Cuzco, or to Plaintiffs Cuzco and Figueroa, is immaterial.
As discussed in the following paragraph, the employer-employee relationship was the same
between the Defendants and all of their workers.

For the reasons set forth above, it is undisputed the Defendants employed Plaintiffs and other similarly situated workers within the meaning of the FLSA and NYLL.  Therefore, Plaintiffs are entitled to summary judgment on this question.[4]

B.      Defendants Failed to Pay Plaintiffs Overtime, as Required by the FLSA

The FLSA requires employers to pay "not less than one and one-half times the regular rate" at which an employee is employed for all hours in excess of forty hours worked during a workweek.  See 29 U.S.C. § 207.  Defendants do not dispute that they paid the same flat hourly rate to their workers for the first forty hours worked in a week as they paid for all hours worked in excess of forty hours.[5]  (Pl. SUF at ¶¶ 28, 32, 35, and 38)[6].  Therefore, Defendants failed to

---

[4]  It is similarly undisputed that Defendants were an enterprise engaged in commerce or in the production of goods for commerce, and that Plaintiffs and others similarly situated were engaged in commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a)(1). (Pl. SUF at ¶¶ 7-8; Vazquez Decl. at ¶¶ 4-6; 10/2007 Cuzco Decl. at ¶¶ 12-13).

[5]  Vojtech Bystricky, Esquire, Defendant Jan Kvas's attorney, took a subsequent deposition of Mr. Kvas on September 11, 2007.  In that pre-scripted deposition, Mr. Kvas appeared to have changed his position about whether he paid overtime and spread of hours premiums, suggesting that the workers' regular rate was the state minimum wage, and based on that, the workers' wages exceeded the minimum wage plus time-and-one-half.  It is hard to imagine how this argument can be presented in a legally cognizable fashion.  Still, regardless of the merits – or lack thereof – of Defendants' new theory, such a radical change in position in the waning days of discovery should not be recognized by the Court.

Defendants never submitted an errata sheet for their October 2006 deposition, then requested leave of the Magistrate Judge to submit one in June 2007.  Plaintiffs opposed the request, arguing that Defendants had ample opportunity to correct the record, affirmatively opted not to do so, and then subsequently waived their right to do so by allowing the 30-day deadline to pass.  See Qatar Nat'l Navigation & Transp. Co. v. Citibank, N.A., Case No. 89 Civ. 464, 1996 U.S. Dist. LEXIS 15424 (S.D.N.Y. Oct. 16, 1996) (quoting Calloway v. Marvel Entertainment Group, Div. of Cadence Industries Corp., 110 F.R.D. 45, 52 (S.D.N.Y. 1986) (errata sheet not permitted after six month delay)).  The Magistrate Judge denied the Defendants' request, but allowed Mr. Bystricky to depose his client at his expense.  A prescripted deposition in the waning days of discovery has the same effect as submitting a new affidavit attempting to change the Defendants' earlier testimony.  This has been expressly prohibited by the Second Circuit, see Margo v. Weiss, 213 F.3d 55, 60-61 (2d Cir. 2000) ("Plaintiffs cannot defeat a motion for

(continued...)

-8-

pay overtime as required by the FLSA and Plaintiffs' summary judgment motion should be

granted with respect to the Plaintiffs' FLSA overtime claims.

      C.      Defendants Failed to Pay Plaintiffs the Minimum Wage, Without Improper

              Deductions, as Required by Federal Law.

The FLSA minimum wage requirements extend beyond simply setting a minimum hourly

pay rate.  Employers are also prohibited from making extra deductions which would reduce the

pay rate to fall below the minimum.  Employees may not be required to purchase "tools of the

trade" unless they are reimbursed for the cost, as tools of the trade inure primarily to the benefit

and convenience of the employer.  See 29 C.F.R. § 531.3(d)(2).  The U.S. Court of Appeals for

the 11th Circuit has found that

> If an expense is determined to be primarily for the benefit of the employer, the
> employer must reimburse the employee during the workweek in which the
> expense arose. . .. Situations in which items such as required tools or uniforms
> were purchased before the first workweek are not explicitly covered by the
> regulations. However, there is simply no legal difference between an employer
> requiring a worker to have the tools before the first day of work, requiring the
> tools to be purchased during the first workweek, or deducting the cost of the tools
> from the first week's wages. Compliance with the FLSA is measured by the
> workweek. . ..Workers must be reimbursed during the first workweek for
> pre-employment expenses which primarily benefit the employer, to the point that
> wages are at least equivalent to the minimum wage.

Arriaga v. Fla. Pac. Farms, LLC, 305 F.3d 1228, 1237 (11th Cir. 2002) (internal citations

omitted).

---

[5](...continued)
summary judgment by responding with affidavits recanting that earlier testimony").  For these
reasons, the Court should not consider Mr. Kvas's new deposition testimony.

     [6]  Plaintiffs have set forth extensive references to the record in the Statement of Facts
section of the instant Memorandum of Law, as well as in their Statement of Undisputed Facts.
Therefore, in the Argument section, Plaintiffs will, where appropriate, reference only their
Statement of Undisputed Facts.

Defendants acknowledge that Plaintiffs and other similarly situated workers were required to purchase some tools as a condition of employment.  Specifically, Defendants required workers "to own hand tools and at least two power tools, a circular saw and a sawsall." (Pl. SUF at ¶¶ 20-21, and 27).

The cost of these tools brought the hourly wages of Plaintiffs Cuzco and Figueroa – as well as other similarly situated workers – below the minimum during the first week of work.  (Pl. SUF at ¶¶ 22-27).  Therefore, in violation of the FLSA, Plaintiffs and other similarly situated workers did not earn the minimum wage.

Additionally, the FLSA is violated unless the federal minimum wage is paid on the employee's regular payday.  See 29 U.S.C. § 206; see also 29 C.F.R. § 790.21(b); Biggs v. Wilson, 1 F.3d 1537, 1540 (9th Cir. 1993); Rogers v. City of Troy, 148 F.3d 52, 57 (2d Cir. 1998) (stating that "it is clear that the FLSA requires wages to be paid in a timely fashion.").  In the state of New York, for manual workers such as Plaintiffs, the regular pay day must be weekly.  See New York Labor Law §191 (requiring payment of wages within seven calendar days of the end of the week in which the wages were earned).  If an employer delays the payment of the employee's wages beyond the regular payday, the employer has not complied with the minimum wage provisions of the FLSA. See 29 U.S.C. § 206; see also Biggs, 1 F.3d at 1540. Therefore, even if the employer later paid the employee his wages, the employee is still entitled to recuperate liquidated damages in the amount of 100 percent of the late minimum wages.  See id.; Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 711 (1945) (employee is not required to sue for unpaid wages in order to recover FLSA liquidated damages); cf. Rogers, 148 F.3d at 56-57 (recognizing liability for liquidated damages for late payment of wages, but not

awarding them when court construed the city's one-time slight delay in the payment of wages to update an inefficient payroll system to be a legitimate business purpose).[7]

Even if workers had agreed to be paid late, such an agreement cannot constitute a waiver of an employee's rights to liquidated damages under the FLSA.  See Rogers, 148 F.3d at 59; see, e.g., Barrentine v. Arkansas-Best Freight Sys., 450 U.S. 728, 740-41, 101 S. Ct. 1437, 1444-45 (1981) (recognizing the importance of strict limits on employee's ability to waive claims for unpaid wages or overtime under the FLSA for fear that employers would coerce employees into settlement and waiver); Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1352-53 (11th Cir. 1982) (stating that employees cannot waive FLSA claims for unpaid wages or overtime with two exceptions: (1) USDOL-supervised settlements, and (2) judicially-approved stipulated settlements); Manning v. New York Univ., Case No. 98 Civ. 3300, 2001 U.S. Dist. LEXIS 12697, *35-36  (S.D.N.Y. August 22, 2001) (same); Walton v. United Consumers Club, Inc., 786 F.2d 303, 306 (7th Cir. 1986) (affirming that private settlements of FLSA suits would "allow [parties] to establish sub-minimum wages.").

Defendants acknowledge consistently paying workers approximately four weeks after the first day of work.  (Pl. SUF at ¶¶ 47-52).  Therefore, because the late payment of wages is not disputed, Plaintiffs and other class members as a matter of law are entitled to 100 percent FLSA liquidated damages, based on the federal minimum wage of $5.15 per hour,[8] for each workweek for which they did not receive his wages until after their state law-mandated regular payday; a week after the conclusion of their workweek. See New York Labor Law § 191.

---

[7]  Unlike the unique factual situation in Rogers there is no indication that Defendants had a legitimate business purpose exempting them from this obligation.

[8]  Throughout the period of Plaintiffs' employment, and the time period covered by the class claims, the federal minimum wage was $5.15 per hour.  See FLSA, 29 U.S.C. § 206.

For the reasons set forth above, Defendants violated the FLSA by requiring Plaintiffs and others similarly situated to purchase tools of the trade, and by not paying Plaintiffs and others similarly situated weekly.  Therefore, Plaintiffs and others similarly situated are entitled to summary judgment on their FLSA minimum wage claims.

Finally, Defendants did not pay Plaintiff Cuzco for approximately 125 hours of work he did in 2005 until over one year after the work was completed.  (Pl. SUF at ¶ 53)  This clearly violates the FLSA requirement that manual workers receive at least the minimum wage per hour and be paid weekly, and Mr. Cuzco is entitled to 100 percent liquidated damages on the extent of this minimum wage underpayment.  Therefore, Plaintiff Cuzco is also entitled to summary judgment on this minimum wage claim.

D.      Defendants Violated the Minimum Wage, Overtime, Timely Payment of Wages, and the Spread of Hours Provisions of New York Labor Law

Plaintiffs individually and on behalf of the putative class seek summary judgment on each of their New York Labor Law claims.  As with the FLSA, improper deductions are a violation of New York minimum wage laws.  See New York Labor Law §§ 198-b, 652.  Additionally, New York Labor Law adopts the FLSA overtime provisions.  See 12 NYCRR §142-2.2.  As outlined in § V(B), *supra*, Defendants have admitted to not paying overtime and to requiring Plaintiffs and other workers to purchase their own tools.  Therefore, Plaintiffs and members of the putative class are entitled to summary judgment on these aspects of their New York Labor Law claims.

New York Labor Law requires that all manual workers be "paid weekly and not later than seven calendar days after the end of the week in which the wages are earned." New York Labor Law § 191(a)(i).  Plaintiffs and other similarly situated workers are clearly manual workers

under New York Labor Law.  See New York Labor Law § 190(4) (manual worker is "a

mechanic, workingman or laborer"); Matter of Angello v. Labor Ready, Inc., 859 N.E.2d 480,

481 (NY 2006) (examples of manual labor include stocking shelves and yard work); People by

Mitchell v. Interborough Rapid Transit Co., 154 N.Y.S. 627, 630 (App. Div. 1915) (term should

be understood as it is "ordinarily and naturally used."); IKEA U.S. v. Industrial Bd. of Appeals,

660 N.Y.S.2d 585, 586 (App. Div. 1997) (see generally People by Mitchell for determination if

employment is within the meaning of § 190(4)).

Defendants admit that Plaintiffs and other workers were paid every two weeks, and

sometimes had to wait to get paid.  Payment was also sometimes delayed when workers were

paid by Defendants with checks that were returned for insufficient funds.  Moreover, Defendants

admit that the first day of a pay period was approximately four weeks prior to the date workers

were paid and that the pay period concluded approximately two weeks prior to the date the

workers were paid.  As a result, Plaintiffs and other workers were not paid at all until they had

worked for the Defendant for 30 days.  (Pl. SUF at ¶¶ 47-52).  Finally, as discussed above,

Defendants did not pay Plaintiff Cuzco for approximately 125 hours of work he did in 2005 until

over one year later.  (Pl. SUF at ¶ 53).  Therefore, Plaintiffs and members of the putative class

are entitled to summary judgment on their claims that Defendants violated the timely payment of

wages provision of New York Labor Law.

New York Labor Law also regulates spread of hours pay.  Under New York Labor Law,

if the spread of hours of a workday exceeds ten hours, the employee "shall receive one hour's

pay at the basic minimum hourly wage rate." 12 NYCRR § 142-2.4.  See also Yang v. ACBL

Corp., 427 F. Supp. 2d 327, 339-40 (S.D.N.Y. 2005).  Defendants acknowledge that Plaintiffs

and other workers often worked a spread of hours of more than ten hours in a day but did not

receive an extra hour of pay at the state minimum wage.  (Pl. SUF at ¶¶ 39-45).  Therefore, Plaintiffs and members of the putative class are entitled to summary judgment on their spread of hours claims.

For the reasons set forth above, and because the relevant facts are undisputed, Plaintiffs' summary judgment motion with respect to the state law minimum wage, overtime, spread of hours, and timely payment of wages should be granted.

E.      The Current Plaintiffs are Entitled to Summary Judgment on Damages; and an Inquest Should Be Held on Class Damages.

If the Court grants Plaintiffs' motion for summary judgment as to liability, the back wages and other damages owed Plaintiffs Saul Marcelo Cuzco, Bolivar Guirachocha, and Claudio Figueroa are easily ascertainable, and there is no dispute over the underlying facts. Therefore, these Plaintiffs are entitled to summary judgment on damages.[9]

1.      Overtime Damages.[10]

a.      Plaintiff Saul Marcelo Cuzco

Under the Fair Labor Standards Act, employers must pay overtime premiums at a rate of one and one-half times employees' "regular rate" of pay for hours worked in excess of 40 hours in a workweek.  See FLSA, 29 U.S.C. § 207(a).  The regular rate is "the hourly rate actually paid

---

[9]  If the Court denies summary judgment on the current Plaintiffs' damages claims but grants summary judgment on liability, the current Plaintiffs respectfully request an inquest on their damages.

[10]  Plaintiffs are not seeking liquidated damages for violations of New York Labor Law. Therefore, actual damages for violations of the FLSA's overtime provisions and New York Labor Law's overtime provisions are identical.  Still, as set forth below, Plaintiffs are seeking pre-judgment interest for Defendants' New York Labor Law violations.

the employee for the normal, non-overtime workweek for which he is employed." Yang, 427 F.

Supp. 2d at 338(internal citations omitted); see also 29 C.F.R. §§ 778.108 - 110.

Plaintiff Cuzco's regular rate of pay generally increased over the course of his

employment, ranging from $8.50 per hour to $12.00 per hour.  (Pl. SUF at ¶¶ 13 - 17).  The

hours Plaintiff Cuzco worked in 2003 and 2004 are reflected in the Defendants' payroll and bank

records.  (Vazquez Decl. at ¶¶ 8-9).  However, the Defendants did not produce any payroll

records reflecting Plaintiff Cuzco's hours in 2005, although Plaintiffs requested these records.

(Pl. SUF at ¶ 12)..

Where an employer is unable to produce payroll records, employee plaintiffs are entitled

to use their best faith estimates of hours worked to compute FLSA damages, after which the

burden shifts to employer to rebut these estimates.[11]  See Anderson v. Mt. Clemens Pottery Co.,

328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946); Yang, 427 F. Supp. 2d at 335-37.  A

Plaintiff may rely on his recollection alone to meet his burden.  Id. at 335-36 (citing Mumbower

v. Callicott, 526 F.2d 1183, 1186 (8th Cir. 1975)) ("relying on employee's recollection was

proper, otherwise employers could 'benefit from their failure' to maintain required records.").

In the instant case, Plaintiff Cuzco recalls that he worked approximately 50 hours per

week in 2005.  (Pl. SUF at ¶ 54; 10/2007 Cuzco Decl. at ¶ 7).  Because Defendants failed to

produce Plaintiff Cuzco's payroll records for this period, Plaintiff is entitled to a presumption

that his recollection is correct.  See Yang, 427 F. Supp. 2d at 335-36.

It is undisputed that the Defendants did not pay overtime premiums to Plaintiff Cuzco

when he exceeded 40 hours of work in a workweek.  (Pl. SUF at ¶¶ 28-30).  Based on the

_____

[11]  As similar requirement exists under New York Labor Law where an employer does
not maintain payroll records.  See NYLL § 196-a.

Defendants' payroll and bank records from 2003 and 2004, based on the presumption that Plaintiff Cuzco worked approximately 50 hours per week in 2005, and based on Plaintiff Cuzco's uncontroverted regular rate of pay, Defendants owe Plaintiff Cuzco $1,909.44 in unpaid overtime wages. (Pl. SUF at ¶¶ 28-30)[12]

b.      Plaintiff Claudio Figueroa

Plaintiff Claudio Figueroa's regular rate of pay was $14.00 per hour when he worked for the Defendants. (Pl. SUF at ¶ 19). Plaintiff Figueroa worked 49 hours during one workweek. (Pl. SUF at ¶ 31). He was not paid overtime premiums for the nine hours of overtime he worked during that week. (Figueroa Decl. at ¶ 5). Therefore, Defendants owe Plaintiff Figueroa $63.00 in unpaid overtime. (Pl. SUF at ¶¶ 31-33.

c.      Plaintiff Bolivar Guiracocha

Plaintiff Bolivar Guiracocha's regular rate of pay was $10.00 per hour when he worked for the Defendants. (Pl. SUF at ¶ 18). Plaintiff Guiracocha worked 41.5 hours during one workweek. (Pl. SUF at ¶ 34). He was not paid overtime premiums for the 1.5 hours of overtime he worked during that week. (Guiracocha Decl. at ¶ 5). Therefore, Defendants owe Plaintiff Guiracocha $7.50 in unpaid overtime. (Pl. SUF at ¶¶ 34-36)

d.      Total Overtime Underpayment.

For the reasons set forth above, Plaintiffs are entitled to unpaid overtime wages in the amount of $1,979.94. Because the calculations set forth above are based on undisputed facts, Plaintiffs are entitled to summary judgment on their unpaid overtime wages as a matter of law.

---

[12]   The methodology used to arrive at this figure is explained with detail in the October 26, 2007 Declaration of Diana Vazquez.

3.      Tool Reimbursement

Each of the Plaintiffs spent at least $250.00 on tools of the trade that Defendants required

them to provide.  With the exception of a $100 sawsall which Plaintiff Cuzco purchased two

months into his employment[13], the Plaintiffs purchased all of these tools before they started

working for the Defendants.  These costs brought the wages of Plaintiffs Cuzco and Guiracocha

below the federal and state minimum wage during their first week of work.  Therefore, Plaintiffs

Cuzco and Guiracocha are entitled to damages in the amount of the resulting minimum wage

underpayment.

The following chart reflects the Plaintiffs' first week's cash paid, the wages received

after the deduction for the tools, and the resulting minimum wage underpayment.

| Plaintiff | Cash Wages Piad | Wages after Deductions | Actual Hourly Wage | Minimum Wage Underpayment |
|---|---|---|---|---|
| Saul Marcelo Cuzco | $195.00 (week of 12/30/02 - 1/5/03) | $195 - $150 (without sawsall)= $45 | $45/23 (hours worked) = $1.96 | $5.15 (FLSA/NYLL minimum wage) - $1.96 = $3.19 (hourly shortfall) x 23 hours = **$73.37**. |
| Saul Marcelo Cuzco (sawsall) | $149.00 (week of 2/24/03 - 3/2/03) | $149 - $100 (for sawsall) = $49.00. | $49/17.5 (hours worked) = $2.80 | $5.15 - $2.80 = $2.35 (hourly shortfall) x 17.5 hours = **$41.12** |
| Claudio Figueroa | $686 (week of 11/1/04 - 11/7/04) | $686 - $250 = $436 | $436/49 (hours worked) = $8.90. | No underpayment. |
| Bolivar Guiracocha | $295 (week of 8/21/03 - 8/27/03) | $295 - $250 = $45 | $43/29.5 (hours worked) = $1.46 | $5.15 - $1.46 = $3.69 (hourly shortfall) x 29.5 hours = **$108.85** |
| | | | TOTAL: | **$223.24** |

(Pl. SUF at ¶ 20-26).

---

[13]  Plaintiff Cuzco is entitled to reimbursement for the sawsall the week after he
purchased it.

Plaintiffs do not expect the cost of the tools to be disputed with evidence of admissible quality by the Defendants and the hours worked during the Plaintiffs' first workweeks are based on the Defendants' own payroll records.  Therefore, Plaintiffs are entitled to summary judgment on FLSA unpaid minimum wages in the amount of $223.24.

        4.     Liquidated Damages

        a.     General Standard

An employee who suffers violations of the minimum wage or overtime provisions is entitled to liquidated damages in an amount equal to the unpaid minimum and overtime wages. See FLSA, 29 U.S.C. § 216(b).  The only exception to the 100 percent liquidated damages provision of the FLSA is if the employer acted in "good faith" *and* "had reasonable grounds for believing" that he was not violating the FLSA.  See 29 U.S.C. § 260. Good faith "requires more than ignorance of the prevailing law or uncertainty about its development.  It requires that an employer first take active steps to ascertain the dictates of the FLSA, and then move to comply with them."  Reich v. Southern New England Telcoms. Corp., 121 F.3d 58, 71 (2d Cir. 1997).

There is no evidence that the Defendants made any effort to determine what was required by the FLSA, let alone attempt to comply with the FLSA's requirements.

        b.     Liquidated Damages for Overtime Violations and Minimum Wage Violations Arising out of Tool Costs.

As set forth above, Plaintiffs' unpaid overtime totaled $1,979.94.  Because Plaintiffs are entitled to an equal amount as liquidated damages, Plaintiffs' total damages for unpaid FLSA overtime wages are **$3,959.88**.  Likewise, Plaintiffs' total FLSA unpaid minimum wages resulting from the required purchase of tools of the trade are $223.24.  Therefore, with the

addition of liquidated damages, Plaintiffs' FLSA damages for the tool purchase requirement are **$446.48**.

        c.      Liquidated Damages for Late Wages.

As set forth above, Plaintiffs are entitled to liquidated damages at the FLSA minimum wage rate for wages that were paid after the New York Labor Law-mandated regular payday.  As set forth in § V(C), *supra*, Defendants have admitted – and this is reflected in the Defendants' payroll and bank records – that they paid their employees at the most bi-monthly, and at least two weeks *after* the last day of the subject pay period.  Therefore, Defendants never paid Plaintiffs on or before the required regular payday.

Based on the above, Plaintiff Cuzco is entitled to **$18,476.12** as liquidated damages for late wages.  This is calculated based on a total of 3,587 hours worked (Vazquez Decl. at ¶ 9, Ex. B), and liquidated damages are calculated at the federal minimum wage of $5.15 per hour.

Likewise, Plaintiff Figueroa worked a total of 85 hours for the Defendants.  At the $5.15 hourly minimum wage, Plaintiff Figueroa is therefore entitled to **$473.75** as liquidated damages.  Finally, Plaintiff Guiracocha worked 63 hours for the Defendants and therefore should be awarded **$324.45** as liquidated damages.

        5.      Spread of Hours Damages

As set forth in § V(D), *supra*, on days when an employee's spread of hours from his start time to his finish time exceeds ten hours, that employee is entitled to one additional hour of pay at the applicable New York minimum wage rate.  The New York minimum wage was $5.15 per hour in 2003 and 2004, and increased to $6.00 per hour on January 1, 2005.  See NY Labor Law § 652.

Based on Defendants' payroll and bank records, Plaintiff Cuzco's spread of hours exceeded 10 hours on 95 days in 2003, 74 days in 2004, and 40 days in 2005.   (Vazquez Decl. at ¶ 9, Ex. B).   Therefore, Plaintiff Cuzco's total spread of hours damages at the applicable New York minimum wage are $1,110.35.   Plaintiff Guiracocha's spread of hours exceeded 10 hours on 6 days in 2003.   Therefore, Plaintiff Guiracocha is entitled to $30.90 in spread of hours damages.[14]

>        6.        Class Damages

If this Court grants the Plaintiffs summary judgment on Defendants' liability to the plaintiff class, Plaintiffs respectfully request that the Court refer this matter to the U.S. Magistrate Judge for an inquest on class damages, which are less easily ascertainable and are more likely to be subject to factual disputes than the damages of the current Plaintiffs.[15]   Inquests on damages where partial summary judgment is granted as to liability are frequently ordered by this Court.   See, e.g., Fabry's S.r.L. v. IFT Int'l, Inc., Case No. 02 Civ. 9855, 2003 U.S. Dist. LEXIS 8597, *21 (S.D.N.Y. 2003); McCoy Assocs. v. Nulux, Inc., 218 F. Supp. 2d at 294.

>        7.        Interest

Plaintiffs and class members are entitled to pre-judgment interest on their New York Labor Law actual damages claims.   See Zeng Liu v. Jen Chu Fashion Corp., Case No. 00 Civ. 4221, 2004 U.S. Dist. LEXIS 35, at *16  (S.D.N.Y. January 7, 2004).   The statutory interest rate in New York is 9 percent, see NY C.P.L.R. § 5004, calculated on a simple, rather than compound, basis.   See Barry v. Atkinson, Case No. 96 Civ. 8436, 1999 U.S. Dist. LEXIS 12294,

---

[14]  Plaintiff Figueroa did not suffer spread of hours damages.

[15]  Uncertainty of damages should not serve as a bar to partial summary judgment on liability.  See McCoy Assocs. v. Nulux, Inc., 218 F. Supp. 2d 286, 293-94 (S.D.N.Y. 2002).

*26 (S.D.N.Y. August 10, 1999).  In a case such as this, where damages were accrued over an extended period of time, courts may apply the "midpoint of the accrual of damages" method to calculate pre-judgment interest owed.  See Zeng Lui, 2004 U.S. Dist. LEXIS 35 at *16-17. Plaintiffs therefore request that the Court order Defendants to pay pre-judgment interest based on the midpoint method, from the date the Court enters final judgment.

VI.     Conclusion

        For the reasons set forth herein, Plaintiffs are entitled to partial summary judgment as to liability on all claims brought by Plaintiffs individually and on behalf of the putative class. Further, Plaintiffs Saul Marcelo Cuzco, Claudio Figueroa, and Bolivar Guiracocha are entitled to summary judgment on damages in the amount $23,680.68.  Plaintiffs also respectfully request that the Court order an inquest as to class damages.  Finally, Plaintiffs request that the Court order payment of statutory pre-judgment interest based on the "midpoint of the accrual of damages method" from the date of final judgment in this action.

Dated:          Kingston, New York
                October 26, 2007                    Respectfully Submitted,


                                                    s/ Daniel Werner
                                                    Daniel Werner (DW-9986)
                                                    dan@workersrightsny.org
                                                    WORKERS' RIGHTS LAW CENTER
                                                         OF NEW YORK, INC.
                                                    101 Hurley Avenue, Suite 5
                                                    Kingston, NY  12401
                                                    (845) 331-6615
                                                    Facsimile: (845)331-6617

                                                    ATTORNEYS FOR PLAINTIFFS

-21-

# LEXIS CASES

LEXSEE 1999 US DIST LEXIS 12294

**JOHN F. BARRY, JOSEPH G. COTE, JOHN A. FRABOTTA and RICHARD E. OMOHUNDRO, JR., Plaintiffs, - against - LAWRENCE T. ATKINSON, Defendant.**

**96 Civ. 8436 (PKL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 12294*

**August 10, 1999, Decided
August 10, 1999, Filed**

**DISPOSITION:** [*1] Court found defendant liable to plaintiffs in the amount of $ 354,848.83, plus interest at a simple annual rate of 9% on the amounts owed plaintiffs following Combined's breach of its delivery obligation on January 6, 1994.

**COUNSEL:** Richard J.J. Scarola, Esq., of counsel, SCAROLA & REAVIS, New York, New York, for Plaintiffs.

Stephen E. Tisman, Esq., of counsel, SHIFF & TISMAN, New York, New York, for Defendant.

**JUDGES:** Peter K. Leisure, U.S.D.J.

**OPINION BY:** Peter K. Leisure

**OPINION**

*OPINION AND ORDER*

LEISURE, *District Judge*:

This case involves a gold deal gone sour. Plaintiffs, four investors in Combined Metals Reduction Company ("Combined"), a Nevada-based gold mining concern, bring this diversity action against defendant Lawrence Atkinson, the guarantor of gold bullion Combined was supposed to have delivered to plaintiffs in exchange for their investment. Plaintiffs allege, in essence, that defendant has breached his guaranty obligation by failing to pay plaintiffs a cash equivalent for the undelivered gold.

In September 1998, the Court conducted a bench trial regarding the disputed issues in the case, and the parties have subsequently submitted post-trial briefs further addressing [*2] those issues. Having considered the parties' post-trial submissions and the evidence presented at trial, the Court sets forth herein its findings of fact and conclusions of law pursuant to *Rule 52(a) of the Federal Rules of Civil Procedure*.

**FINDINGS OF FACT**

**I. The Subscription Agreement and Guaranty**

In or about October 1992, Atkinson, a Nevada resident who at that time controlled Combined, inquired of plaintiffs whether they would be interested in investing in the company. *See* Trial Transcript [hereinafter "Tr."], at 21-22, 24-26, 365-66. Atkinson told plaintiffs their investment capital would be used to pay off certain of Combined's debts in order to attract another, more significant investment that would allow gold production to commence at Combined's then-unfinished "Mohave" gold mine and recovery plant. *See* Tr. 26, 37-38; Pl. Ex. 4. Atkinson stated that in return for their investment, plaintiffs would receive shares of Combined and a portion of the gold production from the "Mohave" facility.

After plaintiffs expressed interest in investing, Atkinson submitted for their review two agreements he had drafted: a Subscription Agreement, to address plaintiffs' [*3] investment and the consideration to be received in return, and a Guaranty Agreement (the "Guaranty"), by which Atkinson would guaranty a cash payment to plaintiffs in the event that, for whatever reason, the gold was not delivered to them. *See* Tr. 28, 32, 35, 178, 370-71; Pl. Exs. 1 & 2.

During negotiation of the two agreements, plaintiff John Barry, the principal negotiator for plaintiffs, told Atkinson that plaintiffs would only make the investment if they could sue Atkinson in the event he failed to fulfill his guaranty. *See* Tr. 33-34. In this regard, Barry proposed that certain provisions be added to the Guaranty to facilitate plaintiffs' ability to sue Atkinson in New York City. *See id.* Those provisions included a New York choice-of-law clause and a clause by which Atkinson would consent to service of process in New

York City and to personal jurisdiction before any New York state or federal court. *See id.* Atkinson agreed to those provisions, incorporated them into the Guaranty, and never challenged Barry's assertion that plaintiffs would be entitled to sue Atkinson directly to enforce the Guaranty. *See* Tr. 34-35.

In or about December 1992, copies of the Subscription [*4] Agreement were executed by each of the plaintiffs and Atkinson, acting on behalf of Combined. *See* Tr. 375; Pl. Ex. 1. The Guaranty was executed that same month. *See* Pl. Ex. 2.

The signed agreements are not models of clarity in contract drafting, and there are many inconsistencies between and within them. However, the documents, when read together, provide for the following basic transaction:

    1. Plaintiffs shall make a capital investment in Combined, with plaintiffs Joseph Cote, John Frabotta and Richard Omohundro investing $ 65,000 each, and plaintiff John Barry investing $ 130,000;

    2. In exchange for their investments, plaintiffs shall receive a portion of the common stock of Combined and, by January 5, 1994, part of Combined's gold production from the "Mohave" mine;

    3. In the event the gold is not delivered by that date, Atkinson guarantees payment to plaintiffs Cote, Frabotta and Omohundro of $ 97,500 each, and to plaintiff Barry of $ 195,000; [1] and

    4. Atkinson, as guarantor, shall provide a trustee with collateral worth at least $ 600,000, to be liquidated by the trustee and disbursed to plaintiffs and certain other investors to attempt to fulfill [*5] Atkinson's payment obligations, if they are triggered.

*See* Pl. Exs. 1 & 2. The Guaranty provides that Atkinson's liability as guarantor shall be limited to $ 600,000, excluding any costs of collection. *See* Pl. Ex. 2, § 4.1; Def. Post-Trial Mem. at 4 n.2.

    1    The parties agree that, contrary to the Subscription Agreement, Barry actually contributed $ 130,000, not $ 115,000, and, thus, the disbursement due Barry under the Guaranty in the event of non-delivery is $ 195,000 rather than $ 172,500. *Compare* Pl. Exs. 1 & 2 *with* Tr. 17, 99, 101-02, 376; Plaintiffs' Post-Trial

Memorandum and Post-Trial Proposed Findings of Fact, dated November 23, 1998, at 27 n.12; *and* Post-Trial Memorandum of Law of Defendant Lawrence T. Atkinson [hereinafter "Def. Post-Trial Mem."], dated November 23, 1998, at 4 n.3.

## II. Plaintiffs' Attempts to Recover on the Guaranty

After the Subscription Agreement and Guaranty were executed, plaintiffs made the specified capital investments in Combined and [*6] received the stock portion of the consideration for their investments. The January 5, 1994 deadline for delivery of the gold portion of the consideration, however, came and went, and the gold was, in fact, never delivered. *See* Tr. 206; Pl. Ex. 5.

In mid-January 1994, the gold had still not been delivered and neither Combined nor Atkinson had tendered any substitute payment to plaintiffs. Plaintiffs, therefore, notified Combined and Atkinson that they were in default of their contractual obligations. *See* Pl. Ex. 5. Atkinson responded that he would attempt to remedy the situation by personally undertaking to sell the Guaranty collateral in order to pay plaintiffs the amounts owed. *See* Pl. Ex. 6.

In mid-1994, Combined obtained financing that enabled it to pay plaintiffs $ 232,500, a little less than half the amount owed plaintiffs as of January 5, 1994. *See* Tr. 56, 58, 211. As to the remaining amounts owed, however, no gold delivery or cash payment appeared forthcoming from Combined, the Guaranty collateral had still not been liquidated and Atkinson did not appear to be producing funds from any other source to pay plaintiffs. Plaintiffs complained to Atkinson about his [*7] failure to pay under the Guaranty. *See* Tr. 61. Atkinson, in response, suggested that plaintiffs make a demand that the trustee of the Guaranty collateral, Joseph Nicholls, a friend of Atkinson, liquidate the collateral and pay plaintiffs. *See id.* Plaintiffs followed that advice, but Nicholls informed them that he did not believe any collateral actually existed. *See* Pl. Ex. 7; Tr. 153-54, 173-74. Nicholls directed plaintiffs to contact Roderick Carucci, a lawyer and long-time acquaintance of Atkinson. *See* Tr. 62-63. However, after a few conversations with Barry, Carucci stopped returning Barry's phone calls. *See* Tr. 63-64. By letter dated March 8, 1995, plaintiffs were informed that Nicholls was resigning as trustee due to his poor health and that they should contact Carucci regarding any matters concerning the Guaranty. *See* Pl. Ex. 8. Thereafter, plaintiffs again attempted on numerous occasions to contact Carucci, but to no avail. *See* Tr. 65.

On or about March 29, 1995, Barry expressed to Atkinson plaintiffs' growing dissatisfaction with the state of affairs and told him that plaintiffs were on the verge of suing him to recover the amounts owed. *See* [*8] Tr. 68.

Barry asked Atkinson if there was any way to avoid litigation. *See id.* In a responsive letter, Atkinson stated that Combined would be able to pay plaintiffs two installments of $ 116,250 each in May and June 1995. *See* Pl. Ex. 12. To ensure such a payment, Atkinson advised plaintiffs that they should:

> "1) Write to me, demanding that I cause a new trustee [of the Guaranty collateral] to be appointed;
>
> 2) agree to accept the proposed payments . . . ; and
>
> 3) consult New York counsel in preparation for bringing an action against Combined Metals and myself to enforce the Guarantee, but not file the action pending our payment as proposed."

*Id.*

After the proposed payment by Combined failed to come to fruition, plaintiffs brought suit against Atkinson and Combined in Nevada state court, demanding payment of the amounts owed and appointment of a new trustee. *See* Tr. 75; Pl. Ex. 14. While the Nevada litigation was pending, however, the board of directors of Combined removed Atkinson as Chairman and Chief Executive Officer because, among other things, he had allegedly engaged in a check-kiting scheme on behalf of the company. *See* Tr. 80, 86-87. Plaintiffs [*9] allowed the Nevada lawsuit to be dismissed with prejudice after discussions with Combined's new management led plaintiffs to believe an amicable resolution could be achieved. *See* Tr. 87, 89-90.

To plaintiffs' chagrin, however, Atkinson subsequently regained control of Combined, removed the directors who had ousted him, including Barry, and sued those directors for alleged breach of fiduciary duty in two separate suits brought in Nevada and Utah state courts. *See* Tr. 90-91; Def. Ex. R. Meanwhile, plaintiffs still had not been paid the amounts owed.

In July 1995, Atkinson appointed Wayne Goldman, an employee of Combined, as putative trustee of the Guaranty collateral. *See* Tr. 260-61. Atkinson told Goldman there was nothing he should do as trustee, and divulged to Goldman that the original Guaranty collateral had been substituted with worthless assets in order to attempt to preclude recovery by plaintiffs. *See* Tr. 262-67.

Subsequently, even upon appointment of yet another putative trustee of the Guaranty collateral, the alleged collateral has not been liquidated and plaintiffs have not otherwise been paid. *See* Tr. 403-04, 424. On November 12, 1996, plaintiffs filed [*10] the instant suit to recover the amounts owed.

## CONCLUSIONS OF LAW

Defendant does not dispute plaintiffs are owed at least $ 255,000 due to Combined's failure to deliver the gold by January 5, 1994. *See* Tr. 423. Defendant contends, however, that plaintiffs cannot sue him directly to recover the amounts owed but must, instead, sue the trustee of the Guaranty collateral. Defendant further argues that even if plaintiffs may sue defendant directly, the instant suit is nonetheless inappropriate because (i) an alleged condition precedent to suit, liquidation of the Guaranty collateral and determination that the liquidated amount is insufficient to pay plaintiffs, has not occurred, and (ii) plaintiffs failed to join as parties the other beneficiaries of the Guaranty and the trustee, as allegedly required by *Rule 19 of the Federal Rules of Civil Procedure*. Finally, assuming the instant lawsuit has been properly brought, defendant objects to certain aspects of plaintiffs' calculations of damages and costs.

For the reasons that follow, the Court finds that plaintiffs' suit is proper, but that defendant is correct to object to certain of plaintiffs' damage and cost assertions.

## [*11] I. Plaintiffs' Standing to Sue Atkinson

Plaintiffs are intended beneficiaries of the Guaranty. The Guaranty expressly designates them "Beneficiaries" and is structured to confer on them the benefit of the agreement's performance, *i.e.*, delivery of gold or payment of a dollar equivalent thereto. *See* Pl. Ex. 2. As intended beneficiaries, under New York law plaintiffs may sue to enforce the Guaranty. The decisions of the courts of that state reflect "old law that a third party may sue as a beneficiary on a contract made for his benefit." *Port Chester Elec. Constr. Corp. v. Atlas,* 40 N.Y.2d 652, 655, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976); *see also Alicea v. City of New York,* 145 A.D.2d 315, 534 N.Y.S.2d 983, 985 (1st Dep't 1988) ("The law is settled that an intended beneficiary of a contract may maintain an action as a third party"); *Flickinger v. Harold C. Brown & Co., Inc.,* 947 F.2d 595, 600 (2d Cir. 1991) ("New York law follows the Restatement (Second) of Contract § 302 (1979) in allowing a third party to enforce a contract if that third party is an intended beneficiary of the contract.").

Where the litigants in this [*12] case part ways is over *who* plaintiffs may sue to enforce the Guaranty. Defendant contends the Guaranty allows plaintiffs to sue only the trustee, while plaintiffs say the Guaranty allows them to sue either the trustee or Atkinson. In its Memorandum Order denying plaintiffs' summary judgment motion, the Court found the Guaranty ambiguous in this regard and concluded from the extrinsic evidence offered at that stage that factual disputes existed regarding the parties' intentions. *See*

*Barry v. Atkinson*, 1998 U.S. Dist. LEXIS 7378, No. 96 Civ. 8436, 1998 WL 255431, at *3-*4 (S.D.N.Y. May 20, 1998). With the full record now before it, the Court finds that the parties intended for plaintiffs to be able to sue either the trustee or Atkinson. [2]

    2    The Court notes parenthetically that neither party has asserted the Guaranty constitutes a trust instrument governed by New York trust law; both rely on general New York contract law. Accordingly, the Court's summary judgment opinion and this decision also apply New York contract law.

    In any case, analyzing the Guaranty through the lens of the law of trusts would not alter the outcome in this case. Applying that law, the Court would find: (i) that the Guaranty is ambiguous as to whether plaintiffs may sue Atkinson directly, and (ii) that the extrinsic evidence indicates that Atkinson, as putative settlor, intended to allow plaintiffs to sue him. *See Mercury Bay Boating Club, Inc. v. San Diego Yacht Club, 150 A.D.2d 82, 90, 545 N.Y.S.2d 693* (1st Dep't 1989) (extrinsic evidence admissible to resolve ambiguity as to settlor's intent in trust instrument); *see also State Bank of Albany v. United States, 1974 U.S. Dist. LEXIS 8034*, No. 71 Civ. 205, 1974 WL 719, at *6-*7 (N.D.N.Y. June 18, 1974) (similar, collecting cases).

[*13]    At trial, plaintiffs proffered credible testimony that they had understood, in negotiating the Subscription Agreement and Guaranty, that they would be able to sue Atkinson directly. *See* Tr. 33-34, 344-45, 354. Plaintiffs also proved at trial that Atkinson himself understood this. Barry proffered persuasive testimony that he specifically told Atkinson while negotiating the agreements that plaintiffs would only strike a deal if they could sue him directly. *See* Tr. 33-34. In addition, Barry testified that he had represented to Atkinson that plaintiffs were proposing to add provisions to the Guaranty that were related to plaintiffs' contractual right to sue him in New York City. *See* Tr. 33-34; *see also* Tr. 326-27. Atkinson adopted those provisions and, during the negotiations, never contradicted Barry's statements that plaintiffs could sue him. [3] *See* Tr. 34-35. In fact, Atkinson never represented to plaintiffs at any time prior to this lawsuit, including during the Nevada litigation pursued by plaintiffs, that they could not sue him directly. *See* Tr. 54-55, 69-70, 381-83.

    3    Those provisions corroborate Barry's testimony regarding the parties' intentions. For example, the consent-to-jurisdiction clause added to the Guaranty provides in relevant part that "the parties hereto consent to the jurisdiction of State and Federal Courts" in New York City. Pl. Ex. 2,

§ 6.1. Atkinson and the trustee are identified in the Guaranty as residing and/or doing business in Nevada, *see id.*, preamble, while plaintiffs reside in or relatively near New York state, *see* Joint Pretrial Order, dated August 25, 1998, P 1. If it were contemplated that only the trustee could sue Atkinson, then it is hard to see why New York City would be chosen as the preferred forum for litigation between two Nevada-based parties. At a minimum, one would expect those parties to have consented to a Nevada forum as well.

[*14]    Even more persuasive than Atkinson's tacit acknowledgment of his intent is his affirmative representation in 1995 that plaintiffs can sue him directly. In the course of advising plaintiffs on how best to ensure payment of the remaining amounts owed, Atkinson stated that they should "consult New York counsel in preparation for bringing an action against Combined Metals *and myself* to enforce the Guarantee". Pl. Ex. 12 (emphasis added); *see also* Tr. 69-70.

    Based on all the aforementioned evidence, the Court finds the parties intended for plaintiffs to be able to sue Atkinson directly. None of the evidence or arguments offered by defendant persuade the Court to reach a contrary conclusion. [4]

    4    Although most of defendant's arguments in this respect do not warrant discussion, the Court does note and specifically reject defendant's assertion that allowing plaintiffs to sue Atkinson would conflict with provisions of a trust agreement executed between Atkinson and Nicholls. *See* Def. Ex. B. As an initial matter, it appears that Atkinson fabricated that document to further his interest in avoiding payment. The Court bases that finding on the following: (i) Atkinson had an uneasy demeanor at trial when discussing that document; (ii) Atkinson failed to provide the document to plaintiffs until a year after they made their investment, *see* Tr. 32-33, 61, 92-94, 355-56, even though the agreement purports to be signed on their behalf and contains plaintiffs' putative directives to the trustee, and (iii) Atkinson has continued to assert, incorrectly, that the trust agreement is "explicitly referenced in the Subscription Agreement", Def. Post-Trial Mem. at 21, which the Court views as a transparent attempt to lend credence to the document.

    In any event, even were the Court to consider that trust agreement competent evidence, it would not alter the outcome in this case. The trust agreement does not cure the ambiguity as to whether plaintiffs can sue Atkinson and, thus, at most is one piece of evidence to be considered in

assessing the parties' intent. Weighing that document along with the other evidence, the Court remains convinced that the parties intended to allow plaintiffs to sue Atkinson. The Court is of the same opinion regarding the deposition testimony of Nicholls purporting to set forth his intention in signing the Guaranty, a document he did not, notably, participate in negotiating.

[*15] **II. Liquidation of Collateral as Alleged Prerequisite to Suit**

Defendant further argues that even if plaintiffs are permitted to sue him, they may only do so once the Guaranty collateral has been liquidated and the trustee has determined that that liquidated amount is not sufficient to pay them. Based on this argument, defendant contends plaintiffs' lawsuit is premature because the collateral has not yet been liquidated.

Assuming, without deciding, that the Guaranty would normally require liquidation of the collateral prior to suit by plaintiffs, the Court finds that that requirement was rendered inapplicable when, in or about June 1994, Atkinson breached the Guaranty by substituting the original collateral with worthless real property. *See* Tr. 153-54; *see also* Tr. 266-67.

The Guaranty states in pertinent part that Atkinson may

"substitute . . . collateral . . . provided that the substituted collateral will be as or more readily converted to cash as the original Collateral and that the aggregate quick sale value of all of the collateral be not less than Seven Hundred Fifty Thousand Dollars ($ 750,000) if in a form other than cash equivalents, or Six Hundred [*16] Thousand Dollars ($ 600,000) if in the form of cash equivalents."

Pl. Ex. 2, § 5.1. Atkinson's substitution clearly violates this provision. Given Atkinson's breach and the resultant lack of meaningful collateral, any alleged requirement that plaintiffs first look to the collateral no longer applies.

**III. Joinder of the Other Beneficiaries and Trustee**

Defendant's final general objection is that plaintiffs' failure to join the other beneficiaries of the Guaranty and the putative trustee as parties to this lawsuit requires dismissal of the action pursuant to *Rule 19 of the Federal Rules of Civil Procedure*. The Court rejects this argument as well.

*Rule 19* sets forth a two-step inquiry as to whether

an action must be dismissed for failure to join an individual or entity. The first step of the test focuses on whether joinder of the person is necessary, that is, whether either:

(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or [*17] impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

*Fed. R. Civ. P. 19(a)*; *see generally Jota v. Texaco, Inc., 157 F.3d 153, 161-62 (2d Cir. 1998)*. Where joinder is deemed necessary, the absent person must be joined if feasible. *See Fed. R. Civ. P. 19(a)*. If, however, joinder is not feasible, either because the person is not subject to service of process or joinder would deprive the court of subject matter jurisdiction, then *Rule 19(b)* directs the court to determine, based on consideration of various factors, whether "in equity and good conscience the action should proceed among the parties [currently] before [the court], or should be dismissed, the absent person being thus regarded as indispensable." *Fed. R. Civ. P. 19(b)*.

Defendant argues that joinder of the absent beneficiaries is necessary under *Rule 19(a)(2)* because of the $ 600,000 limit on Atkinson's liability under the Guaranty. According to defendant, should the other beneficiaries not be joined, recovery by plaintiffs [*18] of more than their allocated portion of Atkinson's guaranty will necessarily preclude the absent beneficiaries from subsequently recovering the full amount allocated to them.

The Court finds that joinder of the absent beneficiaries is not required. First, the absent beneficiaries have accepted securities in Combined in lieu of the amounts owed them under the Guaranty. *See* Tr. 223-24. Thus, they do not, in fact, have any interest in how much plaintiffs recover in this lawsuit. Second, even assuming the absent beneficiaries might retain some interest in the litigation, the Court is precluded from considering the effect of such an interest because the absent beneficiaries have not themselves "claimed an interest" in this suit. *Fed. R. Civ. P. 19(a)(2)*. The Second Circuit has held that consideration of whether joinder is mandated under "'subparts (i) and (ii) [of *Rule 19(a)(2)*] [is] contingent . . . upon an initial requirement that the

absent party claim a legally protected interest relating to the subject matter of the action.'" *ConnTech Dev. Co. v. University of Connecticut Educ. Properties, Inc., 102 F.3d 677, 682 (2d Cir. 1996)* (brackets altered from original) [*19] (quoting *Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir. 1983)); see also Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 49 (2d Cir. 1996); Laborers Local 17 Health & Benefit Fund v. Phillip Morris, Inc., 179 F.R.D. 417, 420 (S.D.N.Y. 1998); M.C. v. Voluntown Bd. of Educ., 178 F.R.D. 367, 370 (D. Conn. 1998); Swain v. American Auto Accessories, Inc., 1997 U.S. Dist. LEXIS 3383*, No. 96 Civ. 7908, 1997 WL 137442, at *3 (S.D.N.Y. March 25, 1997). Atkinson's attempt to "assert [an interest] on behalf of" the absent beneficiaries does not satisfy that prerequisite. *Peregrine Myanmar Ltd., 89 F.3d at 49.* As the Second Circuit has succinctly put it, "it is the absent parties that must assert an interest." *Id. at 49* (quoting *Fed. R. Civ. P. 19(a)(2)); see also M.C., 178 F.R.D. at 370* ("the absent party itself must assert an interest in the subject matter of the pending case" for *Rule 19(a)(2)* potentially to apply).

Defendant also asserts, pursuant to *Rule 19(a)(2)*, that the trustee is a necessary party. His theory in this regard is that if the absent beneficiaries [*20] were to be awarded in another proceeding their full allocation under the Guaranty, then plaintiffs' recovery in this suit of more than their allocated amount could result in the trustee being subjected to liability in excess of the Guaranty's $ 600,000 liability limit.

This argument fails for at least three reasons. First, the hypothetical suit by the absent beneficiaries seems unlikely to occur because those beneficiaries have settled. Second, even if the absent beneficiaries did sue, defendant has failed to articulate how the trustee could be held liable for the amounts owed by Atkinson pursuant to the Guaranty. Finally, insofar as the trustee could be held liable, he, like the absent beneficiaries, has failed to come forward to "claim [such] an interest" in this lawsuit. *Fed. R. Civ. P. 19(a)(2).* Without a claim by the trustee, the Court is precluded from considering his joinder in this action. [5] *See ConnTech Dev. Co., 102 F.3d at 682; Peregrine Myanmar Ltd., 89 F.3d at 49.*

---

5   The failure of any absent person to "claim an interest" in this litigation also precludes the Court from considering defendant's apparent argument that joinder is necessary because otherwise *he* could be held liable for an amount exceeding the Guaranty's liability limit. *Fed. R. Civ. P. 19(a)(2); see ConnTech Dev. Co., 102 F.3d at 682.* Even if the Court could reach that argument, however, the Court would reject it because, among other things, the absent beneficiaries' settlement means Atkinson cannot be held liable in excess of the limit.

[*21]  In sum, it is not necessary to join either the absent beneficiaries or the trustee to this action. The Court need not, therefore, consider whether joinder of those parties would be feasible and, if not, whether dismissal of this action pursuant to *Rule 19(b)* is required. *See Associated Dry Goods Corp. v. Towers Fin. Corp., 920 F.2d 1121, 1123 (2d Cir. 1990).*

The Court turns to the damages issues.

## IV. Damages

As previously noted, defendant does not dispute plaintiffs are owed at least $ 255,000. *See* Tr. 423; Def. Post-Trial Mem. at 28 n.7. It also undisputed that, if plaintiffs prevail, they are entitled to recover $ 99,848.83 in attorneys' fees for counsel retained to prosecute this action and the previous Nevada litigation. *See* Pl. Exs. 9, 9a & 10.

Three disputes do exist, however, regarding amounts potentially owing plaintiffs in addition to those sums. Those disputes are: (i) whether the costs of collection recoverable by plaintiffs include compensation for the time Barry spent allegedly providing legal work on the relevant litigations; (ii) whether plaintiffs are entitled to a 50% annual rate of return on the principal amount owed; and (iii) [*22] whether plaintiffs are otherwise entitled to statutory interest. The Court addresses the issues *seriatim*.

### A. *Recoverable Costs*

The Guaranty provides that Atkinson shall be liable for "any costs of collection, including attorneys fees and disbursements", in the event plaintiffs are entitled to recover on the Guaranty. Pl. Ex. 2, § 1. The single cost dispute between the parties is whether Barry, a retired lawyer, may recover for his efforts in connection with this action, the Nevada litigation previously brought by plaintiffs, and the Utah lawsuit being pursued by Atkinson. Barry concedes that the amounts he seeks are not actual expenditures by any of the plaintiffs. However, Barry contends he is nonetheless entitled to recover because his efforts constitute legal work on their behalf. Defendant objects to Barry's request.

The Court doubts that the term "costs of collection" in the Guaranty reasonably encompasses compensation of a party for his or her alleged legal work, especially where the party has retained counsel. However, assuming *arguendo* the Guaranty does allow for such recovery, the Court finds Barry is not entitled to it because he failed at trial to fulfill [*23]  his burden to substantiate the amounts in two critical respects. First, Barry provided insufficient evidence as to the time he has allegedly spent on the litigations. He kept no contemporaneous records in this regard, and his testimony as to his efforts to estimate that time after the fact gave the Court no

confidence that those estimates are even remotely close to accurate. *See* Tr. 110-113; *see also* Pl. Ex. 11. Second, Barry failed to provide any breakdown of the specific tasks allegedly completed in those intervals. *See id.* The lack of detail is particularly troublesome because the evidence suggests at least parts of the work for which he seeks compensation, such as some of his involvement in discovery, were undertaken in his capacity solely as a party, not as a purported legal advisor. Absent any breakdown of his work, the Court has no basis on which to assess, as required under New York law, the "nature of the work done, the need for it, and the amount of time reasonably required". *F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1265 (2d Cir. 1987).* [*]

> 6    The Court notes that even if Barry had substantiated his work in connection with the Utah litigation, the Court would not award him compensation for it because, in the Court's view, his testimony independently failed adequately to establish that his work there is related to collecting the amounts owed plaintiffs under the Guaranty. *See* Tr. 112-13, 177-78.

[*24]    Accordingly, the Court declines to compensate Barry for his putative legal work. Plaintiffs are awarded $ 99,848.83 in costs, the amount adequately documented, and not contested, to have been reasonably spent by them on counsel for the Nevada litigation and the instant action. Should plaintiffs seek, consistent with this Opinion, to recover attorneys' fees incurred post-trial, an appropriate motion shall be served and filed by August 31, 1999; opposition, if any, by defendant shall be due on September 15, 1999; and a reply, if any, shall be due on September 22, 1999. No extensions will be granted absent extraordinary circumstances.

## B. *Alleged Contractual Rate of Return*

Plaintiffs contend they are entitled to a 50% annual rate of return on amounts owed under the Guaranty. Plaintiffs reason that because the Guaranty provides for plaintiffs to recoup 150% of their original investment if the gold is not delivered, "common sense" dictates that the principal amount owed continues to grow at the same rate of return until plaintiffs are paid in full.

The Court rejects plaintiffs' argument. While the Guaranty does provide for payment to plaintiffs of 150% of their investment in the [*25] event Combined fails to deliver the gold by January 5, 1994, nothing in either the Guaranty or the Subscription Agreement suggests a 50% rate of return would continue to accrue in the event of a further delay in delivery or of a default by Atkinson on the Guaranty. Plaintiff Barry so conceded on cross-examination. *See* Tr. 218. Absent some specific provision in the agreements providing for such accrual, the Court will not imply one.

Moreover, while the Court's finding eliminates the need to consider the proffered extrinsic evidence of the parties' intent on this issue, consideration of that evidence obtains the same result. The most compelling such evidence is plaintiffs' own acknowledgment in a document that "the parties have not agreed to a rate of return, if any, during the period of default." Def. Exs. N & O. While the Court found much of Barry's testimony on other subjects entirely credible, the Court rejects as incredible Barry's explanation that this document merely reflects the parties' failed attempt to negotiate a rate of return different than the alleged presumptive one of 50% per annum. *See* Tr. 52-53, 215, 218-19.

## C. *Statutory Interest*

Finally, the Court considers [*26] whether New York's statutory rate of interest may apply. Plaintiffs contend they are entitled to such interest. Defendant, by contrast, insists no such interest may be awarded because the parties did not specifically agree to apply the statutory interest rate.

In diversity actions, the awarding of prejudgment interest is considered a substantive issue and is, therefore, governed by the law of the relevant state, in this case, New York. *See Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999).* New York's generally applicable statutory rate of interest is 9% per annum, which accrues on a simple, rather than a compound, basis. *See N.Y. Civ. Prac. L. & R. §§ 5001(a), 5004; Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 90 (2d Cir. 1998)* (collecting New York authorities); *see also Till v. Paul Frederick Fox & Affiliates, 689 N.Y.S.2d 585, 586* (4th Dep't 1999); *Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991); Nagoya Venture Ltd. v. Bacopulos, 1999 U.S. Dist. LEXIS 7413*, No. 96 Civ. 9317, 1999 WL 311918, at *3-*4 (S.D.N.Y. May 18, 1999).

The Court finds plaintiffs are entitled to statutory interest. [*27] New York law provides that statutory "interest shall be recovered upon a sum awarded because of a breach of performance of a contract." *N.Y. Civ. Prac. L. & R. 5001(a).* This provision has been interpreted to allow for recovery of "'prejudgment interest . . . [at the 9% statutory rate] *as a matter of right* in an action at law for breach of contract'". *Graham v. James, 144 F.3d 229, 239 (2d Cir. 1998)* (emphasis added) (quoting *Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2d Cir. 1984)); see also Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 342 (2d Cir. 1993); United States Naval Institute v. Charter Communications, Inc., 936 F.2d 692, 698 (2d Cir. 1991).* Thus, contrary to defendant's suggestion, the absence of a provision in the parties' agreements adopting the statutory interest rate does not preclude the awarding of such interest.

The only remaining issue in this respect, then, is

when statutory interest began to accrue on the amounts owed plaintiffs. Under New York law, the triggering date for accrual is "the earliest ascertainable date the cause of action existed". *Id. § 5001(b).* [*28] In breach of contract cases involving sureties, including guarantors, that date has been held to be the date the principal obligor, here Combined, breached the obligation guaranteed by the surety, here Atkinson. *See Mid-State Precast Systems, Inc. v. Corbetta Constr. Co., Inc., 202 A.D.2d 702, 706, 608 N.Y.S.2d 546* (3d Dep't 1994); *Morse/Diesel, Inc. v. Trinity Indus., Inc., 875 F. Supp. 165, 176-77 (S.D.N.Y. 1994), rev'd in part on other grounds, 67 F.3d 435 (2d Cir. 1995).*

The Court finds that Combined breached its gold delivery obligation on January 6, 1994, the day after the deadline for delivery. Atkinson, as guarantor of that obligation, is therefore liable for interest on the amounts owed plaintiffs from that date to the date of judgment by this Court, at a simple rate of interest of 9% per year. [7]

> 7   In the event the total amount of the surety's liability, including interest, exceeds the limit of the surety's guaranty, *New York General Obligations Law § 7-301* limits the surety's interest liability to the period from the date of the surety's breach to the date of judgment. *See N.Y. Gen. Oblig. L. § 7-301; see also Mid-State Precast Systems, Inc., 202 A.D.2d at 706; Hunt v. Bankers & Shippers Ins. Co. of New York, 73 A.D.2d 797, 797-98, 423 N.Y.S.2d 718 (4th Dep't 1979); Morse/Diesel, Inc., 875 F. Supp. at 176.* That provision is inapplicable here, however, because defendant's total liability, including interest, does not exceed the Guaranty's $ 600,000 liability limit. Accordingly, the Court need not consider whether Atkinson breached his Guaranty obligations later than January 6, 1994, the date Combined breached.

[*29] **V. Newly-Raised Nevada Judgment**

One final issue, raised by plaintiffs long after the bench trial was completed, remains to be assessed.

In his answer to plaintiff's complaint, defendant asserted as a defense that "plaintiffs are barred by the doctrine of estoppel from enforcing the guarantee sued upon, by reason of their wrongful conduct." *See* Answer, dated March 31, 1997, P 33. Although defendant pursued this wrongful conduct defense in opposing plaintiffs' summary judgment motion, he ultimately abandoned it prior to trial. *See* Joint Pre-Trial Order, dated August 25, 1998, at 10.

By letter dated July 16, 1999, plaintiffs informed the Court of their discovery that, in February 1998, defendant obtained an alleged *ex parte* judgment against them in Nevada state court on a claim identical in substance to the wrongful conduct defense. Plaintiffs now make the unusual request that this Court "adjudicate in favor of plaintiffs and against defendant" on the wrongful conduct defense and further find that judgment preclusive as to any identical or similar claim raised in another action. Letter of Richard J.J. Scarola, Esq. [hereinafter "Scarola Letter"], dated July 16, 1999, at [*30] 2.

The Court rejects plaintiffs' request. As an initial matter, plaintiffs have failed adequately to explain why their request is being raised for the first time almost a year after the bench trial was completed and while its disposition was *sub judice*. Plaintiffs do appear to suggest, albeit only impliedly, that the alleged *ex parte* nature of the judgment impeded them from learning of it. *See id.* at 1-2. Significantly, however, they do not submit any proof that the judgment was, in fact, *ex parte*; no affidavit to that effect has been offered and, strangely, not even a copy of the judgment itself has been submitted. *See id.* Moreover, even if the judgment is *ex parte*, plaintiffs have not explained how or when exactly they became aware of it, or why they could not, through the exercise of due diligence, have discovered it sooner, *i.e.*, prior to the end of the bench trial.

In addition, even if plaintiffs had an adequate excuse for raising the issue this late in the day, they have independently failed to present any authority, and the Court has located none, in favor of the proposition that mere waiver or abandonment of a defense can suffice in itself to support [*31] a specific fact finding as to the conduct that was the subject of the defense. The latter certainly does not logically follow from the former. Absent any such principle of law, the only way in which the Court could make a determination on the merits regarding the wrongful conduct issue would be to reopen the trial and, possibly, allow for additional discovery to ensure full development of the facts. Before even reaching that stage, however, the Court might need to confront the issue whether the Nevada state court judgment itself bars a determination by this Court on the wrongful conduct defense. The Court declines to embark down that road. At a minimum, the interests of the parties in prompt resolution of the issues properly raised in this litigation would be disserved by such a course of action.

Accordingly, the Court declines plaintiffs' invitation to make a finding on the wrongful conduct defense. [8] The Court need not, therefore, reach consideration of the separate, perplexing request by plaintiffs that the Court declare such a finding preclusive in all other forums.

> 8   The Court's decision does not, of course, preclude plaintiffs from asserting, in some other context, that principles of claim preclusion dictate that defendant's failure to pursue the wrongful

conduct defense in this litigation prevents him from asserting elsewhere that plaintiffs engaged in wrongful conduct. The Court does not, however, express any opinion as to whether such an argument should prevail before the Nevada state court or in any other situation.

## [*32] CONCLUSION

For the reasons stated in this Opinion, the Court finds defendant liable to plaintiffs in the amount of $ 354,848.83, plus interest at a simple annual rate of 9% on

the amounts owed plaintiffs following Combined's breach of its delivery obligation on January 6, 1994.

**SO ORDERED.**

New York, New York

August 10, 1999

Peter K. Leisure

U.S.D.J.

LEXSEE 2003 US DIST LEXIS 8597

**FABRY'S S.R.L., Plaintiff, - against - IFT INTERNATIONAL, INC. and ANTONIO MAGGIONI, Defendants.**

**02 Civ. 9855 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 8597*

**May 19, 2003, Decided
May 21, 2003, Filed**

**DISPOSITION:** [*1] Plaintiff's motion for partial summary judgment granted. Defendants' cross-motion to compel arbitration denied. Plaintiff's motion for sanctions and attorney's fees denied.

**COUNSEL:** For Plaintiff: Francesco DiPietro, Esq., DeOrchis & Partners, LLP, New York, NY.

For Defendants: Clyde M. Schaefer, Esq., Carmel, NY.

**JUDGES:** SHIRA A. SCHEINDLIN, U.S.D.J.

**OPINION BY:** SHIRA A. SCHEINDLIN

**OPINION**

*OPINION AND ORDER*

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

On December 13, 2002, Fabry's S.r.L. ("Fabry's") initiated this action against IFT International, Inc. ("IFT") and Antonio Maggioni, as officer of IFT, asserting seven claims: breach of contract, breach of agency agreement, breach of fiduciary duty, conversion, fraud, negligent misrepresentation, and unfair dealing. [1] Fabry's now moves for partial summary judgment against IFT on the breach of contract and conversion claims pursuant to *Rule 56 of the Federal Rules of Civil Procedure* ("Rules"). Defendants cross move pursuant to the Federal Arbitration Act, *9 U.S.C. §§ 3-4*, to compel arbitration [*2] and stay the current action. In its reply, Fabry's further moves for sanctions and reasonable attorney's fees to be imposed on defendants and their counsel pursuant to *Rules 11 and 56(g)*. For the foregoing reasons, plaintiff's motion for partial summary judgment is granted and defendants' cross-motion to compel arbitration is denied. Plaintiff's motion for sanctions and attorney's fees is also denied.

1 Fabry's amended the Complaint on January 30, 2003.

**I. BACKGROUND**

**A. The Agency Agreement**

Fabry's is an Italian company that sells merchandise in the United States. *See* Amended Verified Complaint ("Compl.") P 3. IFT is a New York corporation that imports and distributes apparel and accessories. *See* Defendants' Petition to Compel Arbitration ("Def. Pet.") P 6. On or about December 23, 1998, Fabry's and IFT entered into a Credit Guarantee and Collection Services Agreement (the "Agreement"). *See* Local Rule of Civil Procedure 56.1 Statement of Material Facts in Support of Plaintiff's Motion [*3] for Summary Judgment ("Pl. 56.1") P 1. This Agreement enabled Fabry's to sell merchandise in the United States; using IFT as its agent for the collection of payments, and the management of its accounts. *See id.* P 2; Def. Pet. P 6. [2]

2 Defendants have not submitted either a 56.1 statement, a response to Fabry's 56.1 statement, or an answer.

Pursuant to the Agreement, Fabry's forwarded original invoices for merchandise to IFT and notified its debtors that collection would be managed exclusively by IFT. *See* Pl. 56.1 PP 2, 4-5. In turn, IFT was to collect the accounts receivable and forward them to Fabry's, less IFT's fees and transfer costs. *See id.* PP 5-6; Def. Pet P 6. The Terms and Conditions attached to the Agreement required IFT to forward the receivables on the 10th, 20th, and 30th of each month. *See* Agreement, Ex. A to Compl. at 9. The Terms and Conditions further provide that the "initial annual fee of 2.5% (two point five percent) will be calculated on the actual sales volume realized. [*4] " *Id.* The Agreement also specified that payments made to Fabry's would be at a cost of $ 20 per wire transfer, or at no cost by regular check. *See id.*

In 2002, IFT received $ 354,450.78 in payments from plaintiff's customers. *See* Pl. 56.1 P 7. Although defendant made regular reports to Fabry's of its receipt of these payments as required under the Agreement, it did not forward the money to Fabry's. *See* Pl. 56.1 P 7; Def. Pet. P 3. As a result, Fabry's terminated the Agreement by fax and registered letter on December 5, 2002. *See* Pl. 56.1 P 8; 12/5/02 Letter from F. Mercati to AFT, Ex. C to 2/26/03 Affidavit of Massimiliano Martini, officer of Fabry's ("Martini Aff."). Fabry's then sent Maggioni a letter on December 17, 2002, informing him that if IFT received any further payments from its customers, IFT was to notify Fabry's and forward all payments to it. *See* Pl. 56.1 P 9; 12/17/02 Letter from Martini to Maggioni ("Martini Ltr."), Ex. D to Martini Aff. Fabry's claims that it has "demanded payment on several occasions." Martini Aff. P 11.

After the termination of the Agreement, IFT received an additional $ [*5] 122,489.59 from plaintiff's customers, which it did not forward to Fabry's, bringing the total revenue collected to $ 548,546.76. *See* Pl. 56.1 PP 10-11; Payment Plan, Ex. E to Martini Aff. Fabry's concedes that, pursuant to the agreement, IFT is entitled to fees in the amount of $ 13,713.66, or 2.5 percent of the revenue that IFT has collected but not transferred. *See* Plaintiff's Reply to Memorandum of Law in Support of its Motion for Partial Summary Judgment ("Pl. Rep.") at 7.

### B. The Arbitration Clause

Article 21 of the Agreement contains a "Controversies Resolution" provision, which details the dispute resolution mechanisms that Fabry's and IFT would use for certain disputes arising out of the Agreement. *See* Agreement at 7-8. The first clause provides that the parties "shall attempt in good faith to resolve by mediation any dispute arising out of or relating to this Agreement and to the attached Terms and Conditions." *Id.* at 7. The second clause of article 21 mandates arbitration if "the parties have been unable to resolve by mediation any dispute arising from the interpretation of this agreement." *Id.*

### [*6] II. SUMMARY JUDGMENT

#### A. Legal Standard

*Rule 56* provides for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Under this standard, an issue of fact is material if it "might affect the outcome of the suit under

the governing law." *Shade ex rel. Velez-Shade v. Hous. Auth., 251 F.3d 307, 314 (2d Cir. 2001)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*. "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In its determination of whether a genuine issue of material fact exists, this Court must make all inferences and resolve all ambiguities in favor of the non-moving party. *See Anderson, 477 U.S. at 255*.

Once the moving party has met its burden of demonstrating no genuine [*7] issue of material fact, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*; *see also Elec. Inspectors, Inc. v. Village of East Hills, 320 F.3d 110, 117 (2d Cir. 2003)*. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999)*; *see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)* ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal quotation marks, citations, and alterations omitted). Conclusory statements, conjecture or speculation cannot by themselves create a genuine issue of material fact. *See Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)*. [*8]

### B. Breach of Contract

Fabry's claims that IFT breached the Agreement by failing to transfer the money that defendant received from plaintiff's customers in 2002 and 2003. *See* Compl. PP 48-50. There are four elements of breach of contract under New York Law: the making of a contract; performance of the contract by the plaintiff; breach of the contract by the defendant; and damages suffered by the plaintiff. *See Coastal Aviation, Inc. v. Commander Aircraft Co., 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996)*, *aff'd, 108 F.3d 1369 (2d Cir. 1997)*.

Fabry's asserts that summary judgment is appropriate because Fabry's accepted IFT's offer to provide collection services in return for consideration, and thus the Agreement is a valid contract. *See* Plaintiff's Memorandum of Law in Support of Partial Summary Judgment ("Pl. Mem.") at 8. Fabry's claims that, pursuant to the contract, it sold merchandise to U.S. buyers in 2002 and notified them that all payments must be made directly to IFT. *See* Pl. 56.1 P 2. Moreover, Fabry's contends that IFT has admitted that, from October 2002

2003 U.S. Dist. LEXIS 8597, *

through January 2003, it "collected on behalf of Fabry's [*9] the total sum [of] $ 548, 546.76," which it has not paid to Fabry's. *Id.* P 11.

In response, IFT contends that although it has collected "an amount of monies" that it has not transferred to Fabry's, the amount to be remitted to Fabry's "is in dispute by virtue of fees and expenses which are due and owing to IFT pursuant to the Agreement." Def. Pet P 3. IFT's assertion that the amount of money to be transferred to Fabry's is "in dispute" is not supported by any admissible evidence. Such an assertion, without more, cannot create a genuine issue of material fact. Accordingly, summary judgment is granted to Fabry's on the breach of contract claim.

## C. Conversion

"'Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.'" *Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 53 (2d Cir. 1993)* (quoting *Meese v. Miller, 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (4th Dep't 1981))*. [3] When the original possession is lawful, "conversion does not occur until the defendant refuses [*10] to return property after demand or until he sooner disposes of the property." *Id.* at 54 (quoting *Johnson v. Gumer, 94 A.D.2d 955, 464 N.Y.S.2d 318, 319 (4th Dep't 1983))*.

> 3 The elements of conversion under New York Law are: "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." *Seanto Exports v. United Arab Agencies, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001)* (quoting *Heneghan v. Cap-A-Radiator Shops, 132 Misc. 2d 936, 506 N.Y.S.2d 132, 134 (Civ. Ct. Nassau Co. 1986))*.

Under New York law, "it is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Mfrs. Hanover Trust Co. v. Chemical Bank, 160 A.D.2d 113, 559 N.Y.S.2d 704, 712 (1990)*; [*11] *see also Key Bank of New York v. Grossi, 227 A.D.2d 841, 642 N.Y.S.2d 403, 405 (3d Dep't 1996)*; *Anglo-Iberia Underwriting Mgmt Co. v. Lodderhose, 224 F. Supp. 2d 679, 689 (S.D.N.Y. 2002)*. However, an action for conversion cannot be validly maintained "where damages are merely being sought for breach of contract." *Peters Griffin Woodward, Inc. v. WCSC, Inc., 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (1st Dep't 1982)*. A plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights. *See Calcutti v. SBU, Inc., 223 F. Supp. 2d 517, 523 (S.D.N.Y. 2002)*.

The money at issue here is specifically identifiable as payments for the merchandise sold by Fabry's to its customers in the United States that was collected by IFT. Fabry's was the rightful owner of this money as the owner of the property sold to its customers in the United States. While IFT was authorized to collect payments from plaintiff's customers for whom it had been assigned the invoices, it was obliged to transfer the payments, less fees and transfer costs, to Fabry's on the 10th, 20th, and 30th of each month. Although Fabry's [*12] has demanded payments "on several occasions," IFT has retained control over the revenue and thus interfered with plaintiff's superior possessory right. Martini Aff. P 11. Moreover, after Fabry's terminated the Agreement and demanded that "should IFT receive payments of monies due and owing to Fabry's by its Customers, IFT is instructed to notify Fabry's immediately and to forward such monies to Fabry's accordingly," IFT continued to accept payments and retain them without authorization. Pl. 56.1 P 9; Martini Ltr.

IFT's continued retention of the payments collected from plaintiff's customers without authorization and in defiance of plaintiff's superior right of ownership is sufficient to establish conversion as an action distinct from any breach of contract claim. Because IFT has not disputed the facts as set forth in plaintiff's moving papers regarding its possession of payments made by plaintiff's customers, there is no genuine issue of material fact in dispute and thus summary judgment is granted to Fabry's on the claim of conversion.

## III. ARBITRATION

IFT and Maggioni move to compel arbitration of the Complaint pursuant to clause 21.2 of the Agreement. Defendants [*13] contend that this Court should order the parties to arbitrate their dispute because the Agreement contains a valid arbitration clause, the Agreement containing the clause affects commerce among the several states within the meaning of the *Federal Arbitration Act* ("FAA"), and there is a dispute between the parties arising out of the Agreement. *See* Def. Pet. PP 3, 7, 12-14. Fabry's concedes that the arbitration clause is valid, but argues that it is a narrow clause and that the issues before this Court are outside its scope. *See* Pl. Mem. at 5-6; Pl. Rep. at 5-6.

## A. Legal Standard

The determination of whether a dispute is arbitrable under the FAA comprises two questions: "(1) whether there exists a valid agreement to arbitrate at all under the contract in question ... and if so, (2) whether the particular dispute sought to be arbitrated falls within the

2003 U.S. Dist. LEXIS 8597, *

scope of the arbitration agreement." *Hartford Acc. and Indem. Co. v. Swiss Reinsurance Amer. Corp., 246 F.3d 219, 226 (2d Cir. 2001)* (quoting *National Union Fire Ins. Co. v. Belco Petroleum Corp., 88 F.3d 129, 135 (2d Cir. 1996))*.

Here, the parties agree that there is a valid arbitration [*14] clause, and thus the only relevant question is its scope. Because there is "a strong federal policy favoring arbitration ... where, as here, the existence of an arbitration agreement is undisputed, doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability." *Ace Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 28 (2d Cir. 2002)* (internal quotation marks and citations omitted). Although federal policy favors arbitration, however, it is a matter of consent under the FAA and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001)* (quoting *AT & T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 648, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986))*.

The Second Circuit has established a three-part inquiry for determining whether a particular dispute falls within the scope of the arbitration agreement. *See id. First,* "a court should classify the particular clause as either broad or narrow." *Id. Second,* if the [*15] clause is narrow, "the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause."*Id.* (quoting *Rochdale Vill., Inc. v. Public Serv. Employees Union, 605 F.2d 1290, 1295 (2d Cir. 1979))*. "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." *Id. Third,* if the arbitration clause is broad, "'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it." *Id.* (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 23 (2d Cir. 1995))*.

**B. Discussion**

**1. The Arbitration Clause Is Narrow**

Fabry's contends that the clause is narrow and does not cover its claims against IFT. An arbitration clause is broad if "the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to [*16] the agreement containing the clause." *Id. at 225*. On the other hand, a clause is narrow if "arbitration was designed to play a more limited role in any future dispute." *Id.*

Clause 21.2 of the Agreement is a narrow clause. It mandates that "if the parties have been unable to resolve by mediation any dispute arising from the interpretation of this agreement," the dispute shall be submitted to a single arbitrator. Agreement at 7. In contrast to the mediation clause, which requires the parties to attempt to resolve by mediation "any dispute arising out of or relating to this Agreement and to the attached Terms and Conditions," the arbitration clause only refers to the "interpretation of this agreement." *Id.* The parties' use of precise language in the arbitration clause suggests an intent to limit arbitration to a particular subset of disputes.

**2. The Dispute on Its Face Is Not Within the Purview of the Arbitration Clause**

The next question is whether the dispute "is over an issue that is on its face within the purview of the clause, or over some collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Louis Dreyfus Negoce, 252 F.3d at 224.* [*17] The current dispute arises out of IFT's admitted failure to remit payments it has collected for Fabry's. Plaintiff's action makes claims for breach of contract, breach of agency agreement, breach of fiduciary duty, conversion, fraud, negligent misrepresentation, and unfair dealing for IFT's failure to remit the payments it has collected.

On its face, this dispute does not fall within the purview of the arbitration clause. IFT does not claim that its failure to remit the money it owes Fabry's is a result of a dispute over the interpretation of the Agreement. Although IFT does argue that there is a dispute between the parties concerning the amount of money it owes to Fabry's, it does not argue that this disagreement arises out of differing interpretations of the Agreement. Indeed, IFT and Maggioni do not explain or give any indication of the nature of the dispute over the amount of money IFT owes Fabry's. IFT and Maggioni's petition to compel arbitration is therefore denied.

**IV. SANCTIONS**

Fabry's moves for sanctions and reasonable attorney's fees to be imposed on defendants and their counsel pursuant to *Rules 11(b)and 56(g)*. Fabry's contends that defendants' petition to [*18] compel arbitration contains "several unsupported and blatantly false statements concerning important facts." Pl. Rep. at 10.

**A. Legal Standard**

A violation of *Rule 11* occurs: (1) where a pleading has been interposed for an improper purpose, or (2) where the claims, defenses, and other legal contentions therein are not warranted by existing law or by a non-frivolous argument for a change in the existing law. *See*

*Fed. R. Civ. P. 11(b)*. "An argument constitutes a frivolous legal position for purposes of *Rule 11* sanctions if, under an objective standard of reasonableness, it is clear ... that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Morley v. Ciba-Geigy Corp., 66 F.3d 21, 25 (2d Cir. 1995)* (quoting *Caisse Nationale de Credit Agricole-CNCA v. Valcorp, Inc., 28 F.3d 259, 264 (2d Cir. 1994)).*

A *Rule 11* sanction "is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 395, 110 L. Ed. 2d 359, 110 S. Ct. 2447 (1990).* [*19] As such, *Rule 11* sanctions are not appropriate for all unsuccessful or unpersuasive arguments. *See Shafii v. British Airways, PLC, 83 F.3d 566, 570 (2d Cir. 1996)* (holding an unsuccessful opposition motion to remand not sanctionable under *Rule 11*); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 131 (2d Cir. 1995)*(finding that although plaintiff's claims were properly dismissed on summary judgment, award of *Rule 11* sanctions not warranted).

The Second Circuit has repeatedly held that "sanctions should only be imposed if 'it is patently clear that a claim has absolutely no chance of success,' and all doubts should be resolved in favor of the signing attorney." *K.M.B. Warehouse Distribs., Inc., 61 F.3d at 131* (quoting *Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993)).* The imposition of sanctions is discretionary, and should be granted "with caution." *Knipe v. Skinner, 19 F.3d 72, 77 (2d Cir. 1994).*

### B. Discussion

Defendants' petition to compel arbitration, while not persuasive, does not warrant *Rule 11* sanctions. The dispute between, the parties arises from a [*20] contract that contains an arbitration clause. Therefore, it is not patently unreasonable for defendants to have moved to compel arbitration pursuant to the clause. *See Salovaara v. Eckert, 222 F.3d 19, 34 (2d Cir. 2000)* ("Faulty" attorney's positions "were not so untenable as a matter of law as to necessitate sanction" and were not "the type of abuse of the adversary system *Rule 11* was designed to guard against.") (internal quotations and citations

omitted).

Resolving ambiguities in the light most favorable to the signing attorney, there is no evidence that defendants' primary purpose in bringing the petition to compel arbitration was "for any improper purpose, such as to harass or to cause unnecessary delay." *Fed. R. Civ. P. 11(b)(1)*. As such, sanctions are not justified under *Rule 11(b)(1)*. For the same reason, sanctions are not warranted under *Rule 56(g)*, which authorizes the court to impose sanctions for affidavits "presented in bad faith or solely for the purpose of delay." There is no evidence that defendants have presented affidavits in bad faith.

Fabry's contends that the petition has false factual statements in violation of *Rules 11and 56*. *See* Pl. Rep. [*21] at 8-10. IFT makes several allegations related to plaintiff's unwillingness to continue mediation (*e.g.,* "In contravention of the Agreement Fabry's prematurely withdrew from the mandatory mediation ...."). Def. Pet. P 8. Fabry's contends that it fully cooperated during mediation until the proceedings were concluded. *See* Pl. Rep. at 3. Although the parties' positions differ, IFT's allegations are not necessarily false. The parties simply dispute what ultimately caused the mediation to fail. Whatever the answer, it is irrelevant to the merits of the motion to compel arbitration. *See supra* Part III. IFT's statements are neither material nor blatantly false, therefore, sanctions are unwarranted.

### V. CONCLUSION

In sum, Fabry's is entitled to summary judgment on its claims that IFT unlawfully converted plaintiff's property and breached its contract with Fabry's. Moreover, this dispute is outside the scope of the parties' arbitration agreement. Accordingly, defendants' petition to compel arbitration is denied and plaintiff's motion for partial summary judgment is granted. This case is referred to Magistrate Judge Douglas Eaton for a damages inquest.

SO ORDERED:

Shira [*22] A. Scheindlin

U.S.D.J.

Dated: May 19, 2003

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

LEXSEE 2001 US DIST LEXIS 12697

**GEORGE MANNING, Plaintiff, - against - NEW YORK UNIVERSITY, Defendant.**

**98 Civ. 3300 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2001 U.S. Dist. LEXIS 12697; 86 Fair Empl. Prac. Cas. (BNA) 1240; 81 Empl. Prac.
Dec. (CCH) P40,844*

**August 21, 2001, Decided
August 22, 2001, Filed**

**DISPOSITION:** [*1] Plaintiff's *Fed. R. Civ. P. 60(b)* motion to vacate his "on record" settlement with defendant denied.

**COUNSEL:** For GEORGE MANNING, plaintiff: Antonia Kousoulas, Antonia Kousoulas & Associates, New York, NY.

GEORGE MANNING, plaintiff, Pro se, Ridgewood, NY.

For GEORGE MANNING, plaintiff: Leonard N. Flamm, The Law Offices of Leonard N. Flamm, New York, NY.

For NEW YORK UNIVERSITY, defendant: Dona S. Kahn, Anderson, Kill & Olick, P.C., New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

Plaintiff, George Manning ("Mr. Manning" or "plaintiff"), moves pursuant to *Fed. R. Civ. P. 60(b)* to vacate an in-court settlement he reached with defendant, New York University ("NYU" or "defendant"), on January 30, 2001. Mr. Manning contends that the settlement is voidable because it was not "knowing and voluntary" under the terms of the Age Discrimination in Employment Act (ADEA), *29 U.S.C. §§ 621-634*, as amended by the Older Workers Benefit

Protection Act of 1990 ("OWBPA"), Pub.L. No. 101-433, 104 Stat. 978, codified [*2] in *29 U.S.C. § 626(f)*. For the reasons discussed below, plaintiff's motion is denied and he is ordered to sign the version of the settlement agreement agreed upon by counsel and the Court during the April 4, 2001 conference call.

**BACKGROUND**

The events underlying Mr. Manning's lawsuit are of little relevance to the issue before us and are discussed at length in Magistrate Judge Pittman's July 28, 2000 Report and Recommendation. [1] Briefly, Mr. Manning's lawsuit arose out of his termination as Director of Protection Services at NYU in 1997, when he was 67 years old. He was hired as Director in 1981, prior to which he had been a police officer with the New York City Police Department for 25 years.

> 1   Unless otherwise indicated, all facts are drawn from the Complaint, submissions in conjunction with the previously decided summary judgment motion, submissions in conjunction with the instant motion and matters which occurred in the presence of the Court.

Mr. Manning filed suit on May 8, 1998, alleging [*3] that he was wrongly discharged in violation of the ADEA, Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"), and various state causes of action. NYU defended on the grounds that Mr. Manning was discharged because of his poor communications skills, contentious relationships with his colleagues and superiors, and inability to represent the University adequately to outside agencies and visiting dignitaries. On October 22, 1999, the case was transferred to this Court's docket from Judge Rakoff. NYU moved for summary judgment which we granted in part and denied in part on August 31, 2000, adopting Magistrate Judge Pittman's Report and Recommendation, subject to our clarification.

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

On September 21, 2000, both parties appeared before the Court for a settlement conference. Mr. Manning appeared with his counsel, Antonia Kousoulas. [2] With both parties' permission, the Court commenced the conference by speaking ex parte to each about its settlement position. Mr. Manning suggested that he would accept a package consisting of (1) tuition remission for his stepdaughter, (2) reinstatement, (3) retirement severance benefits, and (4) [*4] a large lump sum payment, in exchange for a release and confidentiality agreement. He initially stated that the size of the lump sum payment would depend on whether the release was a general release or simply a release of the claims in the suit, whether the confidentiality agreement would prevent him from writing a book about his experience at NYU, and whether he was reinstated. NYU, in turn, said that it would settle for: (1) tuition remission for Mr. Manning's stepdaughter, (2) retirement severance benefits, and (3) a payment of up to $ 100,000, in return for a general release and a confidentiality provision covering Mr. Manning's tenure at NYU, the lawsuit and its settlement.

2   Mr. Manning had previously been represented by Arthur H. Forman, Esq.

The Court communicated the essential terms of each side's offer to the other. Based on these initial positions, the two sides engaged in vigorous bargaining through the Court's offices for over two hours. The tuition remission, severance benefits, confidentiality [*5] agreement and general release remained constant terms throughout the discussions. At the end of the day, Mr. Manning stated that he would consider NYU's offer.

On October 2, 2000, Ms. Kousoulas informed that Court that Mr. Manning had made a settlement demand that would cost NYU ran in the "high $ 200,000's." She reported that NYU had refused the demand and planned to retain outside counsel. The Court scheduled a one-week trial to begin on January 29, 2001. For trial, NYU retained Dona S. Kahn, Dana J. Scher and Meredith Fein Lichtenberg from the firm of Anderson Kill & Olick, P.C. and Mr. Manning retained Bonnie Mussman in addition to Ms. Kousoulas.

The trial began on January 29, 2001. On that day, the Court empaneled the jury, both parties made opening statements and Mr. Manning gave substantial testimony on direct examination. In a sad turn of events, however, Ms. Kahn's husband died unexpectedly that evening. When Ms. Lichtenberg informed the Court and Mr. Manning on the morning of January 30, 2001, all agreed that the only appropriate course of action was to declare a mistrial. Furthermore, in light of the Court's trial schedule, both parties consented to have the next trial [*6] in front of Magistrate Judge Pittman.

Once it had declared a mistrial, the Court suggested that both parties seize the opportunity to discuss settlement once again. In speaking with the parties, the Court learned that they had continued negotiating (including during the trial) and had narrowed the difference between their positions considerably -- Mr. Manning had demanded $ 225,000 while NYU was prepared to offer $ 185,000. As in the September 21, 2000 settlement conference, the Court met ex parte with the parties to discuss their positions and communicate the other party's concerns. During these discussions, Mr. Manning negotiated vigorously and down to the last detail. For example, Mr. Manning declared that he wished to write a book based in part on his experiences at NYU. After much back-and-forth with NYU, he succeeded in narrowing the scope of the confidentiality clause so that it would only cover matters related his termination from NYU and lawsuit, and not his professional experiences. Similarly, towards the end of the settlement talks, Mr. Manning persuaded his attorneys to accept a reduction in their fees in order to boost his personal recovery. Pursuant to this arrangement, [*7] he even negotiated to have separate checks cut to himself and his attorneys, apparently for tax reasons. Finally, Mr. Manning accepted the settlement number of $ 199,000, along with the terms previously discussed -- tuition remission, changing his discharge status to "retiree," a confidentiality agreement and a general release.

In communicating the final offer from NYU, the Court explained each of these terms to him once again. Following that explanation, defense counsel wrote-out a summary of the terms on a sheet of paper which Mr. Manning reviewed, assisted by his two lawyers. The parties having agreed upon the written terms, the Court summoned a reporter in order to place the settlement on the record. Finally, in open court, on the record, and with the presence of counsel, Mr. Manning affirmed these settlement terms once again. [3] Pursuant to the confidentiality agreement, the transcript was placed under seal. The Court issued an order that day closing the case

3   The transcript of this exchange reads as follows (January 30, 2001 11:45am Transcript at 2-4.):

THE COURT: ... At this time do one of the two counsel want to put the terms of the settlement on the record?

MS. LICHTENBERG: Yes, your Honor. The terms we have agreed to are as follows: First, Crystal Hicks, the plaintiff's stepdaughter, finish [sic] her bachelor degree from NYU without paying tuition. Second, George Manning will be considered on the record as a retiree from NYU. Third, the plaintiff George Manning will not

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

publish anything pertaining to this lawsuit or the underlying events of his separation from employment from NYU. Fourth, the terms of this agreement shall be confidential. Fifth, NYU will pay to George Manning the sum of $ 199,000 in separate checks. Counsel for the plaintiff will advise counsel for NYU as to the denomination of the two separate checks.

THE COURT: I guess it should be clear that one check will be payable to counsel and the other directly to Mr. Manning.MS. LICHTENBERG: Yes, your Honor.

THE COURT: Mr. Manning, you have heard the terms of the settlement as Ms. Lichtenberg has recited them. Do those accurately reflect the terms that were agreed to previously?

PLAINTIFF MANNING: They do.

THE COURT: It also should be clear that there will be a written agreement of settlement that will be entered into by the parties consistent with the summary terms that have been listed here, and obviously releases will also be exchanged and the case will be discontinued. Is there anything further at this time?

MS. KOUSOULAS: No, judge.

[*8]   This Court next heard from Mr. Manning through new counsel, Gerard Tucker of Tucker & McCabe, LLP, on March 2, 2001, via a fax dated February 28, 2001. In his letter, Mr. McCabe petitioned the Court to withdraw the settlement on the ground that Mr. Manning was coerced in settling. He explained:

The Plaintiff maintained his position not to settle even subsequent to the mistrial, despite what he considers pressure from his legal counsel and from the Court. Plaintiff only relented to settle this matter after his wife was brought into chambers and broke down in tears with threats that her [sic] and her husband would lose everything if he refused to settle. The Plaintiff simply wanted to end his wife's anguish, not settle this case on the terms and conditions therein.

NYU did not receive a fax of the February 28 letter until March 5, 2001 and no copy was ever sent to NYU's counsel. Declaration of Meredith Fein Lichtenberg (hereinafter "Lichtenberg Decl."), at P26, Ex. H. After receiving an opposition letter from Dona Kahn and a reply from Mr. McCabe, the Court held a conference call on March 8, 2001 in which Ms. Kousoulas, Mr. McCabe, Ms. Kahn and Ms. Lichtenberg participated.

[*9]   During the call, the Court first explained that it has made a clerical error in issuing the closing order and would immediately correct it. The Court's clerk mistakenly drafted an order dismissing the action without prejudice to either party re-opening the case within 30 days. However, this Court never intended to issue a dismissal without prejudice and it issued a corrective order on March 13, 2001 clarifying that the original dismissal was with prejudice. The Court then explained to plaintiff's new counsel that no coercion occurred at any time, that the Court had found Mr. and Mrs. Manning totally composed, and that counsel would be wise to consult further with his client concerning these allegations. Mr. McCabe said that he would do so. We never heard from Mr. McCabe again (until he submitted an affidavit in conjunction with the motion at bar) and he never filed a notice of appearance with the Court.

The parties continued negotiating the final language of the settlement agreement throughout this time, exchanging drafts and comments. Lichtenberg Decl. at P29, Ex. F, J. On March 27, 2001, Ms. Kousoulas informed the Court that Mr. Manning refused to sign the settlement papers prepared [*10] by NYU, claiming: (1) he only agreed to release his employment claims, not to a general release, (2) he never consented not to apply for reinstatement, (3) he did not agree to waive his right to sue if he applied for reinstatement and was denied, and (4) he never agreed that he would not participate in other lawsuits against NYU. She sought a ruling from the Court or Magistrate Judge Pittman on the settlement terms. The Court scheduled a conference call for April 4, 2001 to settle the disagreements. On April 2, 2001, Mr. Manning called chambers and declared that he wished to make a *Fed. R. Civ. P. 60(b)* motion.

On April 4, 2001, the Court held a conference call with Ms. Kousoulas and Ms. Kahn. When the Court asked Ms. Kousoulas about the proposed *Rule 60(b)* motion, we learned that Mr. Manning had never consulted with her about it. Nevertheless, the Court heard from both sides and offered the following guidance: (1) the only release discussed was general and there is no doubt that this is what Mr. Manning agreed to, and (2) Mr. Manning's "retiree" status implied that he would not re-apply for his job. However, on the Court's suggestion, NYU withdrew its demand that Mr. Manning consent [*11] not to participate in any lawsuits against it. Mrs. Kousoulas said that she would speak to Mr. Manning, but declared that she might be forced to withdraw if he continued to refuse to sign. On April 4, 2001, Ms. Lichtenberg faxed Ms. Kousoulas a revised copy of the settlement papers incorporating the Court's guidance. Lichtenberg Decl. Ex. K.

On April 24, 2001, the Court received a letter from Mr. Manning's current counsel, Leonard N. Flamm, dated April 19, 2001. In his letter, Mr. Flamm raised for

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

the first time the issue of whether the settlement violated the OWBPA as well as other grounds he argued merited rescinding the settlement. The court held a conference call on April 30, 2001 at which time it set a briefing schedule for this motion.

**STANDARD OF REVIEW**

Fed. R. Civ. P 60(b), provides that a district court may relieve a party or a party's legal representative from a final judgment, order, or proceeding in five enumerated circumstances and, according to a sixth subclause, for "any other reason justifying relief from the operation of the judgment." *Fed. R. Civ. P. 60(b)(6)*. Although to justify relief, the movant must demonstrate "extraordinary circumstances" or "extreme [*12] and undue hardship," *DeWeerth v. Baldinger, 38 F.3d 1266, 1272 (2d Cir. 1994)*, arising from the error, the Second Circuit has held that *Rule 60(b)(6)* "should be liberally construed when substantial justice will thus be served." *Radack v. Norwegian America Line Agency, Inc., 318 F.2d 538, 542 (2d Cir. 1963)*.

**DISCUSSION**

Mr. Manning seeks to have his "on the record" stipulated settlement with NYU voided on the ground that he was given insufficient time to consider its terms, in violation of the OWBPA. We find that assuming, *arguendo*, the OWBPA is applicable to an "on the record" settlement made before the court, at the trial stage, and with the assistance of counsel, NYU has met its burden of proving that Mr. Manning's settlement complied with its requirement. However, we believe that the OWBPA does not apply to a settlement "on the record" such as Mr. Manning's and, hence, that the settlement is enforceable in the same manner as any other stipulated settlement. Nonetheless, regardless of the application of the OWBPA, we conclude that Mr. Manning is obligated to sign the version of the settlement agreement agreed upon by counsel and the [*13] Court during the April 4, 2001 conference call.

**I. Mr. Manning's Waiver was Valid under the OWBPA**

The Older Workers Benefit Protection Act ("OWBPA") provides that "an individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary." *29 U.S.C. § 626(f)(1)*. *Section 626(f)(2)*, in turn, enumerates the six requirements necessary for a "knowing and voluntary" waiver for a plaintiff in Manning's position: [4]

"(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the

average individual eligible to participate;

(B) the waiver specifically refers to rights or claims arising under this chapter;

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement." *29 U.S.C. § 626 [*14] (f)(1)(A-E)*

(G) "the individual is given a reasonable period of time within which to consider the settlement agreement." *29 U.S.C. § 626(f)(2)(B)*

In *Oubre v. Entergy, 522 U.S. 422, 139 L. Ed. 2d 849, 118 S. Ct. 838 (1998)*, the Supreme Court ruled that *29 U.S.C. § 626(f)* should be interpreted strictly and that failure gives a plaintiff grounds for nullifying his settlement. It explained that "the OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word." *Id. at 427*; see also S.Rep. 101-263 at 31-32. However, strict interpretation does not require placing form entirely over function and we must evaluate the circumstances surrounding each waiver in light of Congress' objectives embodied in the OWBPA. See *American Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 118 n.6 (1st Cir. 1998)* (citing *Raczak v. Ameritech Corp. 103 F.3d 1257, 1260 (6th Cir. 1997)*)("Holding an employer strictly accountable for what might be a technical violation of [the OWBPA'S] imprecise terms, with no [*15] indication that this would facilitate the provision's purpose and might even hamper it, is untenable and would elevate form over substance.").

4  Specifically, *29 U.S.C. § 626(f)(2)* provides:

"(2) A waiver in settlement of... an action filed in court by the individual... alleging age discrimination... under section 623 or 633a of this title may not be considered knowing and voluntary unless at a minimum -

(A) subparagraphs (A)

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

through (E) of paragraph (1) have been met; and

(B) the individual is given a reasonable period of time within which to consider the settlement agreement."

The burden is on NYU to prove that Mr. Manning's waiver was "knowing and voluntary." *29 U.S.C. § 626(f)(3)*. [5] We consider each of *Section 626(f)(2)* requirements, in turn, and conclude that NYU has met its burden. Mr. Manning's waiver was "knowing and voluntary" and, hence, is enforceable.

5   "In any dispute that may arise over whether any of the requirements, conditions, and circumstances set forth in... paragraph (2), have been met, the party asserting the validity of a waiver shall have the burden of proving in a court of competent jurisdiction that a waiver was knowing and voluntary pursuant to paragraph... (2)." *29 U.S.C. § 626(f)(3)*.

[*16] *Section 626(f)(1)(A)*

*Section 626(f)(1)(A)* requires that the settlement agreement be written in a manner "calculated to be understood" by the plaintiff. There can be no doubt but that Mr. Manning understood the agreement's terms perfectly well. First, they were presented to him in writing prior to his settlement "on the record". See Lichtenberg Decl., Ex. C. [6] This handwritten summation is clearly expressed in layman's terms. Both Mr. Manning and his counsel reviewed the paper in the presence of the Court.

6   The handwritten settlement outline stated:

". Crystal Hixenbaugh can finish her BA degree from NYU without paying for tuition.

. George Manning will be considered on the record as a 'retiree.'

. George Manning will not publish anything pertaining to this lawsuit or the underlying events of his separation from employment[.]

. Terms of the agreement to be confidential[.]

. NYU to pay the following sum $ 199,000 in separate checks counsel for [plaintiff] will advise."

Second, [*17] the settlement terms were read into the record, in open court, and with the presence of counsel. In New York, "the rule had always been that oral stipulations or concessions made in open court,

despite statutory or rule requirements for writings, would be enforced over the objection of lack of a subscribed writing." See *In re Dolgin Eldert Corp., 31 N.Y.2d 1, 8-10, 334 N.Y.S.2d 833, 838-40, 286 N.E.2d 228 (1972)* (citations omitted). Indeed, an "on the record" stipulation can even satisfy the Statute of Frauds writing requirement. See *Anders v. Anders, 6 A.D.2d 440, 441-442, 179 N.Y.S.2d 274, 275--277 (1972)*, *Rudolph v. Cinco, 34 Misc. 2d 1016, 1017, 229 N.Y.S.2d 892, 894 (1962)*. Although federal law applies because we sit in federal question jurisdiction, the Second Circuit has indicated that, "the federal rule regarding oral stipulations does not differ significantly from the New York rule." *Monaghan v. SZS 33 Associates, L.P., 73 F.3d 1276, 1283 n. 3 (2d Cir. 1996)*; *Willgerodt on Behalf of Majority Peoples' Fund for the 21st Century, Inc. v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997)*. This suggests [*18] that recitation of the agreement's terms into the record alone could have satisfied *Section 626(f)(1)(A)*'s writing requirement. However, regardless of whether this recitation independently satisfied the writing requirement, the "most solemn undertaking" of reciting and affirming the agreement in court further supports the conclusion that Manning understood and agreed to the written settlement terms he received prior to his affirmation record. *In re Cuffee, 232 B.R. 53, 56 (E.D.N.Y. 1999)*.

Finally, there is no question but that Mr. Manning understood settlement terms perfectly well because he had negotiated them for hours, *in the Court's presence*, in the months prior to trial and on the date of settlement itself. The basic terms of the settlement had been negotiated since at least September 21, 2000, when the Court held a settlement conference that lasted over two hours. At that conference, the key issues discussed were (1) tuition relief for Mr. Manning's stepdaughter, (2) the legal status of Mr. Manning's termination, i.e. could he be considered a retiree?, (3) the confidentiality of any settlement, and (4) monetary compensation. Mr. Manning bargained before [*19] the Court, at length and in the presence of counsel on each of these issues. On the morning of the settlement, Mr. Manning again engaged in vigorous negotiation, in the Court's presence, on each of these issues. Indeed, Mr. Manning's command of the agreement's terms and consequences was so complete that at the very end of the negotiations, after he had agreed in principle to make any settlement confidential, he held out for the right to publish works based on his professional experiences at NYU, as opposed to the particular events surrounding his dismissal. NYU ultimately agreed to this distinction and it is reflected in the final settlement language that specifically only prohibited Mr. Manning from "publishing anything pertaining to this lawsuit or the underlying events of his separation from employment." He even required that NYU execute separate checks to his and his counsel in

the hope of avoiding any tax liability on the portion of his recovery that paid for his counsel. Thus, we find that the settlement's terms were presented to him clearly and in writing and we find that he understood them fully when he agreed to them.

### Section 626(f)(1)(B)

To be enforceable, "the [*20] waiver [must] specifically refer[] to rights or claims arising under this chapter." *29 U.S.C. 626(f)(1)(B).* In the hours of negotiations before the Court on September 21, 2000 and January 30, 2001, NYU insisted that there could be no settlement without a complete release of all claims Mr. Manning had or could bring against NYU for events prior to the date of settlement. This position was expressed to Mr. Manning directly by NYU's counsel in open court and repeatedly to Mr. Manning by the Court itself in facilitating settlement talks. At the beginning of the September 21, 2000 conference, Mr. Manning attempted to negotiate limiting the claims waived to only those in the suit, but NYU adamantly refused to accept anything short of a general release. Nothing other than a general release was ever discussed thereafter. Furthermore, when the Court communicated defendant's final settlement offer, the one Mr. Manning accepted, it stated explicitly that the offer was for a general release of all claims against NYU that arose prior to the date of settlement. Mr. Manning agreed to this general release and the Court "specifically referred" to it in describing the settlement [*21] on the record. See January 30, 2001, 11:45am Tr. at 4 (Lichtenberg Decl., Ex. A)("obviously, releases will also be exchanged..."). [7]

> [7] If the Court's reference to the releases was in any way technically deficient, the deficiency was plainly *de minimis*, see *American Airlines, 133 F.3d at 118 n.6; Raczak v. Ameritech Corp. 103 F.3d at 1260*, in light of the surrounding circumstances and Mr. Manning's plain understanding of the general release's consistent term.

### Section 626(f)(1)(C-E)

There can be no serious question but that Mr. Manning's waiver satisfied *Sections 626(f)(1)(C-E)*. *Section 626(f)(1)(C)* requires that the plaintiff "not waive rights or claims that may arise after the date the waiver is executed." NYU never requested such a release, either in court or in the settlement papers memorializing the in-court settlement, and does not seek one now.

*Section 626(f)(1)(D)* ensures that a plaintiff only waives claims in exchange for meaningful consideration. [*22] Id. In the wake of his termination, Mr. Manning had no legal right to tuition remission for his stepdaughter, classification as a "retiree," or a $ 199,000

payment from NYU. These benefits certainly constituted adequate consideration for his waiver and, in the Court's estimation, a very attractive package in light of his case's strength. [8]

> [8] It will be recalled that on the first day of trial that Mr. Manning had testified at some length.

*Section 626(f)(1)(E)* requires that the plaintiff be "advised in writing to consult with an attorney prior to executing the agreement." This requirement is plainly met by the fact that plaintiff was advised by counsel throughout his negotiations on September 21, 2000 and by two attorneys during his negotiations and settlement on January 30, 2001.

### Section 626(f)(2)(B)

The final requirement is that "the [plaintiff] [be] given a reasonable period of time within which to consider the settlement agreement." *29 U.S.C. § 626(f)(2)(B).* Congress [*23] did not specify how a court should determine what constitutes a "reasonable period of time." The Federal Regulations governing of *Section 626(f)*, Title *29 C.F.R. § 1625.22(g)(4)* simply state that "the term 'reasonable time within which to consider the settlement agreement' means reasonable under all the circumstances, including whether the individual is represented by counsel."

In the absence of specific congressional guidance or authoritative caselaw at odds with *29 C.F.R. § 1625.22(g)(4)*, we engage in a case-specific analysis to determine whether Mr. Manning enjoyed a "reasonable time" to consider his waiver. Had Congress wished courts to apply a specific set of standards, it would have enumerated them as it did for waivers signed outside of lawsuits and United States Equal Employment Opportunity Commission ("EEOC") proceedings. *29 U.S.C. § 626(f)(1)*. [9] However, it consciously chose to treat waivers in settlement of lawsuits differently; see S. Rep. No. 101-263 at 32, Older Workers Benefit Protection Act (April 5, 1990), and to leave the determination of "reasonable time" to the court's judgment. [10] [*24]

> [9] *Section 626(f)(1)(F-G)* places additional requirements on settlements prior to lawsuits or EEOC proceedings -- that "[F](i) the individual is given a period of at least 21 days within which to consider the agreement; or (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement; (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired."

10   The Senate Report explained that Congress imposed less burdensome statutory requirements for waivers in the context of litigation or EEOC proceedings because "in the context of ADEA waivers, the Committee recognizes a fundamental distinction between individually tailored separation agreements and employer programs targeted at groups of employees. Individual separation agreements are the result of actual or expected adverse action against an individual employee. The employee understands that action is being taken against him, and he may engage in arms-length negotiation to resolve any difference with the employer." *Id. at 32*.

[*25]   In considering the reasonableness of Mr. Manning's opportunity to consider the proposed settlement and waiver, we are always guided by Congress' stated goals in enacting the OWBPA. Congress' concern in enacting *Section 626(f)(2)(B)* was to give employees recently informed of their termination time to consider their interests and solicit professional advice. The Senate Report accompanying the OWBPA explained:

> [A] a waiver is not valid unless the individual is given a reasonable period of time in which to review and consider the settlement agreement. An employee who is terminated needs time to recover from the shock of losing a job, especially when that job was held for a long period. The employee needs time to learn about the conditions of termination, including any benefits being offered by the employer. Time also is necessary to locate and consult with an attorney if the employee wants to determine what legal rights may exist. *Id. at 33*.

Although these concerns are quite sensible in the case of a recently terminated employee, they plainly do not apply to Mr. Manning's case. Mr. Manning commenced settlement negotiations with NYU in front of this Court in September [*26]   2000, three years after his termination, and did not finalize negotiations until January 30, 2001. Clearly, Mr. Manning's judgment was in no way clouded by "the shock of losing a job." Furthermore, Mr. Manning retained three counsel during the nearly three years from when he filed his complaint in May 1998, to when he settled in January 2001. He received ample professional advice about his rights and enjoyed ample opportunity to consider his course of action in light of that advice.

In considering all of the circumstances surrounding Mr. Manning's acceptance of the settlement, we conclude that there is no doubt but that he had "reasonable time" to consider his waiver. Our confidence in this determination is particularly strong because the Court was physically present for hours of the settlement negotiations leading to the final agreement.

To begin, the basic terms of the settlement were discussed in great detail at the September 21, 2000 settlement conference. As previously described, the Court solicited proposals from both parties ex parte. Mr. Manning communicated that he would accept a package consisting of tuition remission for his stepdaughter, reinstatement, "retiree" classification, [*27]   and a large lump sum payment, in exchange for a release and confidentiality agreement. NYU, in turn, offered tuition remission for Mr. Manning's stepdaughter, a change in Mr. Manning's discharge status to "retiree," and a payment of up to $ 100,000 in return for a general release and a confidentiality provision covering Mr. Manning's tenure at NYU, the lawsuit and its settlement. Throughout the two hours of bargaining that ensued, the tuition remission, discharge status, confidentiality agreement and general release remained constant terms. Thus, five months prior to the settlement, Mr. Manning knew its key provisions. The only term in true dispute was the dollar figure -- NYU was reluctant to pay over $ 100,000 while Mr. Manning stated that he believed the settlement value of his case lay in the range of $ 200-300,000.

The settlement terms were discussed further during the January 30, 2000 settlement conference. As previously discussed during the negotiations that followed, all of which occurred in the Court's presence, Mr. Manning negotiated vigorously and down to the last detail. He demonstrated a firm understanding of the agreement's terms when he negotiated narrowing the confidentiality [*28]   clause so that it would only cover matters related his termination from NYU and lawsuit, and would not prevent him from writing general professional pieces based on his work experience. He exhibited a clear comprehension of the precise impact his lawyers' fees would have on his "take-home" recovery when he negotiated with his two trial counsel to substantially reduce their fees. When the court communicated NYU's final offer, which Mr. Manning accepted, it explained each of the terms to him once again. Then, in open court, on the record, and with the presence of counsel, he affirmed the terms one more time.

Mr. Manning was calm, collected and in complete control throughout all of the proceedings in front of this

Court. His temperament reflected his tenure as a New York City police officer and a sixteen-year tenure as the Director of Protection Services at NYU. Throughout all of the negotiations, we observed that he was assertive, confident, and steadfast in his positions. In over twenty years on the bench, we have seen few plaintiffs this strong-willed and forceful. Furthermore, Mr. Manning faced no time pressure in making his decision -- NYU placed no deadline on accepting its offer [*29] and no new trial date had been set -- and he did not request more time to consider the offer.

It is plain to us that Mr. Manning was keenly aware of exactly the terms he agreed to in his settlement and had considered them at length. He had known all of the key settlement terms, save the dollar figure, for over five months and had vigorously bargained for the monetary settlement to which he finally agreed. Indeed, the final settlement figure was not significantly less than some of his earlier bargaining positions. Mr. Manning's situation could not be any further from the paradigm Congress painted in justifying the OWBPA of an ill-informed, emotionally overwrought, uncounseled older worker pressured to sign a technical boilerplate waiver on threat of losing his severance package or basic benefits like health insurance. This Court has no reservations whatsoever about whether Mr. Manning had "reasonable time" to consider the settlement agreement. [11]

> 11    We also note that even if we were, hypothetically, to rule that Mr. Manning did not have "reasonable time" to consider the settlement terms prior to accepting them on January 30, 2001, his "reasonable time" to disavow them surely ran long before he first informed NYU in early March and the Court that he wished to rescind the agreement. See *Morris v. Waste Mgmt. of Va., Inc., 95 F. Supp. 2d 586, 587 (E.D.Va. 2000)*(plaintiff could not use the OWBPA to rescind an oral settlement agreement of her ADEA claim 27 days later because the delay was "unreasonable")

[*30]    However, we are compelled to express our gravest reservations about the affidavit Mr. Manning submitted in conjunction with this motion. Under oath, Mr. Manning alleged that the following occurred in the final settlement negotiation:

> 5. Thereupon, Ms. Kousoulas' associate brought my wife into Judge Buchwald's Chambers, at the Court's suggestion. My wife became upset as the discussion in Chambers ensued, and then she left. My attorney and I left Chambers a short while later and Defendant's Counsel then went in.
>
> 6. While I was waiting outside

Chambers, my wife was still emotionally upset. I was fearful for her mental and physical condition.

> 7. Shortly after Defendant's Counsel had been in Chambers, I and my attorney were recalled to Chambers. The Judge stated that Defendant had made a final offer of $ 199,000. In view of the aforementioned pressure from my wife and my attorney, and because my wife was so upset, I stated that I would accept the offer. Both counsel then hastened in to the Courtroom to put the settlement on the record.

George Manning's Affidavit in Support of Motion Pursuant to *F.R.C.P. 60(b)*, at PP 5-7.

The truth differs substantially from Mr. [*31] Manning's account. Partway through the January 30, 2001 negotiation, we asked Mr. Manning whether he would like to invite his wife to join him so that he could consult with her about the settlement terms under discussion. He stated that he would and brought her into the robing room. Throughout the entire time Mrs. Manning was in the robing room, she appeared relaxed and comfortable. Indeed, when Mr. Manning and his counsel left the room to consult privately for a few minutes, Mrs. Manning chose to remain and we engaged in social conversation with her about the experience of having children in college and the challenges of early career choices. Mrs. Manning appeared at all times calm, amiable and sociable. Certainly, there was not the slightest hint that she was "emotionally upset," let alone so upset that Mr. Manning should have been "fearful for her mental and physical condition."

Furthermore, Mr. Manning's sworn allegation that his attorneys pressured him into accepting the offer is unbelievable. Throughout the negotiations in front of the Court, Mr. Manning was far more vocal and aggressive than his attorneys. And as previously discussed, Mr. Manning concluded the negotiations [*32] by convincing them to accept a fee reduction in order to boost his recovery. While it was apparent that Mr. Manning's attorneys thought that the substantial settlement was advisable, Mr. Manning's actions were not the actions of a man coerced into settlement by his counsel.

Finally, when the Court relayed NYU's ultimate proposal of $ 199,000, Mr. Manning chuckled at the fact that NYU appeared so sensitive to settling below $ 200,000 before he agreed to the figure. Later, after the parties agreed to the settlement on the record, the Court observed Mr. Manning and his wife smiling and embracing one another, and laughing with his counsel.

Indeed, Ms. Kousoulas purportedly told Ms. Lichtenberg later that "she, Mr. Manning and Mrs. Manning shared a celebratory drink after the Court Supervised Settlement." Lichtenberg Decl. at P20. In light of these observations and the obvious materiality of the issue of coercion to the resolution of this motion, the submission by Mr. Manning of his wholly uncorroborated affidavit was, at the very least, highly ill-advised.

To conclude, considering all of the circumstances, we find that Mr. Manning had a "reasonable time" in which to consider the agreement [*33] and waiver. Accordingly, we find that NYU has met its burden of proving that Mr. Manning's waiver was "knowing and voluntary" under *Section 626(f)(2)* and, hence, is valid.

## II. The OWBPA is Not Applicable to Mr. Manning's Settlement

Our discussion above proceeded on the assumption that the OWBPA is applicable to an in-court on the record settlement at the trial stage. However, we believe that when *Section 626(f)(1)* is read alongside other provisions of the ADEA, in the light of precedent, and bearing in mind Congress' stated objectives in enacting the ADEA and OWBPA, that it does not. Our conclusion derives from the ADEA's explicit incorporation of the Fair Labor Standards Act's ("FLSA"), *29 U.S.C. § 201 et seq.*, enforcement mechanism. Notwithstanding FLSA's general prohibition on individuals waiving claims in conjunction with private settlements, the FLSA has long made an exception for settlement of private lawsuits made "on the record" and subject to judicial scrutiny. Further, we conclude that this exception continues to apply to settlements under the ADEA in the wake of the OWBPA's passage.

A. Statutory History of Judicially-Supervised [*34] Settlement Under the ADEA

In the course of constructing the ADEA, Congress considered several models for its substantive and enforcement provisions including the National Labor Relations Act ("NLRA"), *29 U.S.C. § 151 et seq.*, Title VII, and the FLSA. In the end, Congress settled upon a hybrid scheme, "it modeled ADEA's definition of unlawful discriminatory action and other substantive prohibitions on the language of [Title VII], and modeled ADEA enforcement procedures substantially after [FLSA]." H.R. Rep. No. 101-664 at 17.

Accordingly, the ADEA provides that "amounts owing. . . as a result of a violation of [the ADEA] shall be deemed to be unpaid minimum wages or unpaid overtime compensation [under the FLSA]" and these rights are to be "be enforced in accordance with the powers, remedies, and procedures" of specified FLSA provisions. *29 U.S.C. § 626(b)*. In other words, except as otherwise provided, the ADEA is to be enforced in the

same manner as the FLSA. See *Lorillard v. Pons, 434 U.S. 575, 582, 55 L. Ed. 2d 40, 98 S. Ct. 866 (1978)* ("This selectivity that Congress exhibited in incorporating provisions [*35] and in modifying certain FLSA practices strongly suggests that but for those changes Congress expressly made, it intended to incorporate fully [into ADEA] the remedies and procedures of the FLSA."); *E.E.O.C. v. Kidder, Peabody & Co., Inc. 156 F.3d 298, 302 (2d Cir. 1998)*.

Traditionally, FLSA placed strict limits on an employee's ability to waive claims for unpaid wages or overtime under *29 U.S.C. § 216* for fear that employers would coerce employees into settlement and waiver. See *Barrentine v. Arkansas-Best Freight System, 450 U.S. 728, 67 L. Ed. 2d 641, 101 S. Ct. 1437 (1981)*; *Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 706-7, 89 L. Ed. 1296, 65 S. Ct. 895 (1945)*. With only two exceptions, employees cannot waive FLSA claims for unpaid wages or overtime, for less than full statutory damages. The two exceptions are for: (1) settlements supervised by the Secretary of Labor, and (2) judicially-approved stipulated settlements.

Title *29 U.S.C. § 216(c)*, explicitly carves-out the exception for settlements supervised by the Secretary of Labor. It specifies that "the [supervised] agreement [*36] of any employee to accept such a payment shall upon payment in full constitute a waiver by such employee" of his FLSA claims. This provision was intended to create an incentive for employers to accept voluntarily settlements supervised by the Secretary of Labor. *Sneed v. Sneed's Shipbuilding, Inc., 545 F.2d 537, 539 (5th Cir. 1977)*.

In contrast, the exception for judicially-supervised stipulated settlements finds its basis in case law. Its genesis lies in *D.A. Schulte, Inc. v. Gangi, 328 U.S. 108, 90 L. Ed. 1114, 66 S. Ct. 925 (1946)*, a case in which the Supreme Court held that employees generally may not waive FLSA unpaid wage or overtime claims pursuant to private settlements with employers. *Id. at 116*. In dicta, however, the Court suggested that an exception to FLSA's strict waiver requirements could exist for judicially-supervised stipulated settlements:

"Even though stipulated judgments may be obtained, where settlements are proposed in controversies between employers and employees over violations of the Act, by the simple device of filing suits and entering agreed judgments, we think the requirement of pleading the issues [*37] and submitting the judgment to judicial scrutiny may differentiate stipulated judgments from compromises by the parties."

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

*Id. at 113, fn. 8.*

In the wake of this dicta, a number of Circuit courts held that judicially-supervised settlements were an exception to the rule that employees may not waive FLSA claims. In *Urbino v. Puerto Rico Ry. Light & Power Co., 164 F.2d 12 (1st Cir. 1947)*, the First Circuit ruled:

"It seems to us instead that the Supreme Court in the [D.A. Schulte] statement quoted above must have meant to indicate that it was disposed to permit employees, at least when acting as free agents honestly and fairly advised, and when paid minimum wages and overtime compensation in full, to settle such genuine disputes with their employers as may: arise under the Act by foregoing liquidated damages in whole or in part provided such settlement receives the judicial approval implicit in the entry of a consent judgment." *Id. at 14.*

That same year, the Fifth Circuit, in upholding a lower court decision giving res judicata effect to a stipulated settlement of FLSA claims, held:

"That a bona fide [*38] dispute of both law and fact was involved in the litigation, and that the proposed settlement agreed upon was fair and equitable to all parties concerned. . . The cases of [D.A. Schulte], and [*Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 89 L. Ed. 1296, 65 S. Ct. 895 (1945)]*, relied upon by appellants, are not in conflict with our holding here. They were dealing with settlements between the parties. Here we have a solemn and binding stipulated judgment entered upon disputed issues of both law and fact."

*Jarrard v. Southeastern Shipbuilding Corp., 163 F.2d 960, 961 (5th Cir. 1947)*. See also *Bracey v. Luray, 161 F.2d 128 (4th Cir. 1947)* (citing D.A. Schulte footnote eight in holding that judicially-supervised settlement agreement of FLSA claims between employees and employer was enforceable).

More recent cases have continued to recognize this exception. In *Lynn's Food Stores, Inc. v. U.S. By and Through U.S. Dept. of Labor, Employment Standards Admin., Wage and Hour Div., 679 F.2d 1350 (11th Cir. 1982)*, the Eleventh Circuit explained:

"There are only two ways in which back wage claims arising [*39] under the FLSA can be settled or compromised by employees. First, under *section 216(c)*, the Secretary of Labor is authorized to supervise payment to employees of unpaid wages owed to them. . . [Second] when employees bring a private action for backwages under the FLSA, and present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness." *Id. at 1352-53.*

See *Druffner v. Mrs. Fields, Inc., 828 P.2d 1075, 1078 (C.A. Utah 1992)*; *McKeown v. Kinney Shoe Corp., 820 P.2d 1068, 1071 fn.3 (Alaska 1991)*; *Thomas v. State of La., 534 F.2d 613, 614-15 (C.A.La. 1976)*; H.R. Rep. No. 101-664 at 18-19 ("Alternatively, under section 16(b) of the FLSA, once a private action for back wages has been brought, the plaintiff employees may present to the district court a proposed settlement. The court may then enter a stipulated judgment after scrutinizing the settlement for fairness."). Thus, it is well-settled that an employee may waive a FLSA claim for unpaid wages or overtime pursuant to a judicially-supervised stipulated settlement.

From the [*40] ADEA's enactment in 1967 through the mid-1980's, the FLSA's prohibition against unsupervised waivers governed all ADEA claims, subject only to the exceptions for EEOC [12] and court supervision. However, in 1985, faced with a growing number of ADEA suits, the EEOC proposed a rule permitting "knowing and voluntary" unsupervised waivers under the ADEA. Exemption Allowing for Non- EEOC Supervised Waivers Under the ADEA, *52 Fed. Reg. 32293* (August 27, 1987). It explained that the proposal arose out of its concern that older workers' claims were being prejudiced by the delay in obtaining EEOC supervision of settlements. Id. Although the EEOC acknowledged that the rule conflicted with the FLSA's prohibition on unsupervised settlements, it found that the ADEA's remedial purpose differed from the FLSA's and was better served by allowing "knowing and voluntary" unsupervised waivers similar to those allowed under Title VII. Id.

12    On July 1, 1979, the EEOC assumed enforcement and administrative authority for the ADEA from the Secretary of Labor. H.R. Rep. No. 101-664 at 19. Reorg. Plan No. 1 of 1978, 3 C.F.R. 321 (1978).

[*41] Congress disapproved and quickly suspended the rule for one year, 133 Cong. Rec. S14383-84 (Oct. 15, 1987); 113 Cong. Rec. 2401, 12534 (Dec. 21, 1987),

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

concerned that it was "without legal foundation and contrary to public policy." 135 Cong. Rec. E816 (1989)(statement of Rep. Hawkins). Over the next several years, Congress held hearings on the issue, [see Age Discrimination in Employment Act-Waiver of Rights, S. Hrg. 100-717 (100th Cong., 2d Sess.)(1988); Oversight Hearing on Waivers Under the Age Discrmination in Employment Act, H. Hrg. 100-68 (100th Cong., 2d Sess.)(1988)], and renewed the rule's suspension. 134 Cong. Rec. S10022 (July 27, 1988); 134 Cong. Rec. H8399 (Sept. 27, 1988).

However, while Congress debated, lower courts began enforcing unsupervised waivers of ADEA claims under, different theories. Compare *Bormann v. AT & T Communications, Inc., 875 F.2d 399, 403* (2d Cir.), cert. denied, *493 U.S. 924, 107 L. Ed. 2d 272, 110 S. Ct. 292 (1989)* (applying federal waiver law standard of "totality of the circumstances"); *Coventry v. United States Steel, 856 F.2d 514, 518 (3d Cir. 1988)* (same), with *O'Shea v. Commercial Credit Corp., 930 F.2d 358, 362* [*42] (4th Cir.), cert. denied, *502 U.S. 859, 116 L. Ed. 2d 139, 112 S. Ct. 177 (1991)* (applying common law contract principles); *Lancaster v. Buerkle Buick Honda Co., 809 F.2d 539, 541* (8th Cir.), cert. denied, *482 U.S. 928, 107 S. Ct. 3212, 96 L. Ed. 2d 699 (1987)* (same); *Runyan v. National Cash Register Corp., 787 F.2d 1039, 1044, n. 10, 1045*(6th Cir.) (en banc), cert. denied, *479 U.S. 850, 107 S. Ct. 178, 93 L. Ed. 2d 114 (1986)*(same). In 1990, Congress passed the OWBPA and thereby resolved the circuit dispute by establishing clear and uniform requirements for unsupervised waivers of ADEA claims.

B. The OWBPA Did Not Displace the ADEA's Provision for Judicially-Supervised Settlements

The question before us is whether in adding *Section 626(f)*'s provisions for unsupervised waivers, Congress displaced the traditional FLSA exceptions for EEOC and court supervised settlements. The answer is not entirely resolved by an examination of the language of *Section 626 (f)*. However, the legislative history indicates that it did not. It appears that the new waiver provision's purpose was to expand employees' [*43] ability to settle suits with employers in appropriate circumstances, not to limit it.

Repeatedly, the House and Senate reports that accompanied the OWBPA stated that the Act's provision applied only to "unsupervised" settlements. See, e.g., H.R. Rep. No. 101-664 at 26 ("The bill creates for the first time a class of valid, un*supervised* waivers,") (emphasis added); S. Rep. No. 101-263 at 32 ("The un*supervised* waiver must be knowing and voluntary.") (emphasis added). Indeed, the House Report explained that one of the aims of OWBPA's aims was to "lessen" the burden on the EEOC and courts of supervising waivers:

c. Lessening the burden on the EEOC and the capacity of the courts to supervise waivers

Under the provisions of *[Section 626 (f)]*, a valid waiver obtained in the settlement of a bona fide claim of age discrimination does not require the supervision of either the EEOC or the courts. Thus, this legislation actually lessens the burden on the EEOC for supervision of valid ADEA waivers . . . [by] creating for the first time a class of valid, unsupervised waivers.

H.R. Rep. No. 101-664 at 26. Nowhere in the legislative history is there any [*44] mention of *Section 626(f) replacing* EEOC and court authority to supervise ADEA waivers. It would be bizarre for Congress to speak of "lessening" this burden if, in fact, it was eliminating it altogether.

This absence is important in light of Congress' [13] and the Supreme Court's repeated insistence that the ADEA incorporates FLSA enforcement provisions unless otherwise expressly provided. As explained earlier, the Supreme Court unanimously ratified this interpretation in Lorillard, where it held that "this selectivity that Congress exhibited in incorporating provisions and in modifying certain FLSA practices strongly suggests that but *for those changes Congress expressly made*, it intended to incorporate fully [into ADEA] the remedies and procedures of the FLSA." *Lorillard, 434 U.S. at 582* (emphasis added). Nowhere in the OWBPA's legislative history is there any indication that Congress intended it to overrule Lorillard. Indeed, quite the opposite --in passing the OWBPA, Congress reaffirmed its intent once again: "The Committee has explained in great detail the Supreme Court's unanimous 1978 [Lorillard] decision that the ADEA borrowed its enforcement [*45] provisions (*including supervision of waivers*) from the Fair Labor Standards Act. Congress has expressed unequivocal approval for the decision reached in Lorillard." H.R. Rep. No. 101-664 at 26-27 (emphasis added); see also *id. at 17-18*. Thus, the combination of Congress' repeated description of the OWBPA as applying to "unsupervised" waivers and the utter absence of any indication that it intended the OWBPA to supplant the FLSA's provisions for supervised waivers is strong evidence that EEOC and court supervised waivers were not displaced by *Section 626(f)*.

13   When Congress enacted the ADEA in 1967, Senator Javits explained that "the enforcement techniques provided by [the ADEA] incorporate by reference, *to the greatest extent possible*, the provisions of the [FLSA]." 113 Cong. Rec. Rec.

Case 1:06-cv-02789-THK    Document 68    Filed 10/27/07    Page 52 of 62

Page 12

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

31254 (1967) (S. Javits) (emphasis added); see H.R. Rep. No. 805, 90th Cong., 1st Sess. 2 (1967).

Furthermore, reading the OWBPA to permit on the record judicially-supervised settlements is consistent with [*46] the ADEA's goals of encouraging the swift disposition by avoiding the delays which, as one sponsor noted, "plague so many of our agencies, such as the EEOC and the NLRB. The EEOC, for example, is already years behind in disposing of its docket. Such delay is always unfortunate, but is particularly so in the case of older citizens to whom, by definition, relatively few productive years are left." Age Discrimination in Employment: Hearings on S. 830 and S. 786 Before the Subcommittee on Labor of the Senate Committee on Public Welfare, 90th Cong., 1st Sess. 24-25 (1967) (Remarks of Sen. Jacob Javits (N.Y.)); see 123 Cong.Rec. S17275 (daily ed. Oct. 19, 1977) (Remarks of Sen. Harrison Williams (N.J.) (Senator Williams, another sponsor of the legislation, explained that the ADEA should allow an employee to "resolve the dispute himself or work out a compromise with an employer."). Indeed, the entire purpose of the OWBPA was to encourage and facilitate "knowing and voluntary" settlement of ADEA claims by establishing requirements to ensure reliability and informed decisionmaking in unsupervised agreements. It would certainly have been odd for Congress, in doing so, to have prohibited [*47] the class of court-supervised settlements that it had deemed reliable for decades.

Finally, prohibiting courts from enforcing "on the record" settlement of ADEA claims would seriously impair their ability to facilitate settlement at what is often the most opportune time. We take judicial notice of the fact that imminent prospect of a trial's emotional, physical and economic toll often causes settlements to occur "on the courthouse steps" or after a jury has been empaneled. Furthermore, settlements at this time are more likely to be well considered and meaningful, occurring as they do after discovery, motion practice and other pre-trial activity. Moreover, court supervision and scrutiny of these settlements also has the benefit of the court's substantial trial preparation. Thus, these settlements are generally well-informed, knowledgeably scrutinized, and desirable from the perspectives of both the parties and the court.

However, if in-court supervised settlements were not binding, many could not occur. Much of what a defendant gains with a settlement is the saved effort and expense of avoiding a trial. That value is significantly diminished if the defendant, who has arranged his [*48] counsel and witnesses schedules for the trial, faces the prospect of having to do so all over again if the plaintiff decides days later to revoke his acceptance.

Furthermore, were binding "on the record"

settlements prohibited, scarce judicial resources would be wasted. See *Media Group v. HSN Direct Intl., 202 F.R.D. 110, 2001 U.S. Dist. LEXIS 3497* at *5 (S.D.N.Y. 2001) ("The rule plaintiff seeks. . . is extraordinary, in that recission of the settlement agreement would in effect restore to the Court's calender a civil action that was settled in the midst of trial. . . The burden on the parties and on the court of doing so are particularly severe."). A rule that gives a plaintiff a right new trial if he settles a case mid-trial but then withdraws, is a rule ripe for abuse. Id. ("The Court must be careful to guard against the possibility that parties will seek to manipulate settlements to gain strategic advantage, settling and 'unsettling' litigation to suit their immediate purposes."). Certainly, a court cannot keep a jury empaneled for several days while a plaintiff decides whether he wishes to rescind his "on the record" settlement. As the Second Circuit [*49] explained in *Janus Films v. Miller, 801 F.2d 578, 583 (2d Cir. 1986)*:

> Even if the settlement agreement does not include a completely drafted consent judgment, a court is not obliged to place a trial on hold, to be resumed if the parties fail to agree on the precise wording of a judgment. Due regard for the proper use of judicial resources requires that a trial judge proceed with entry of a settlement judgment after affording the parties an opportunity to be heard as to the precise content and wording of the judgment, rather than resume the trial and precipitate an additional lawsuit for breach of a settlement agreement. This authority should normally be exercised whenever settlements are announced in the midst of a trial.

See also *Hallock v. State, 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984)*("Stipulations of settlement are favored by the courts and not lightly cast aside. This is all the more so in the case of 'open court' stipulations within *CPLR 2104*, where strict enforcement not only serves the interest of efficient dispute resolution but also is essential to the management of court calendars and integrity of the litigation [*50] process.")(citations omitted).

In the absence of any evidence that Congress intended the OWBPA to prohibit enforceable "on the record" settlements, we find that it does not. Moreover, if ever there was an "on the record" settlement made knowingly, voluntarily and knowledgeably, it was Mr. Manning's. Further, the result urged by Mr. Manning

2001 U.S. Dist. LEXIS 12697, *; 86 Fair Empl. Prac. Cas. (BNA) 1240;
81 Empl. Prac. Dec. (CCH) P40,844

would not only be impractical, but would undermine Congress' entire objective in enacting the OWBPA of facilitating knowing and voluntary settlements of ADEA claims. Therefore, we find that Mr. Manning is bound by the "on the record" settlement agreement he struck with NYU.

**CONCLUSION**

"Where the agreement is made, as here, under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as officers of the court, to make every reasonable effort to carry it through to a successful conclusion." *Warner v. Rossignol, 513 F.2d 678 (1st Cir. 1975)*. Indeed, "[a] court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings." *Janus Films v. Miller, 801 F.2d at 583*. [*51] This Court clearly has jurisdiction to compel Mr. Manning to comply with the terms of the Settlement Agreement. See *Morris, 95 F. Supp. 2d at 588* (enforcing settlement agreement involving ADEA waiver after finding that the agreement complied with the OWBPA); see also *In re Air Crash Disaster, 687 F.2d 626, 629 (2d Cir. 1982)* ("It is beyond a district judge's

discretion to . . . refuse to enforce a settlement agreement, absent special circumstances . . ."); *Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974)* ("The district court had not only the power but the duty to enforce a settlement agreement which it had approved. . . [meaning] a district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it."); *Scharf v. Levittown Public Schools, 970 F. Supp. 122, 129 (S.D.N.Y. 1997)*. Accordingly, for the reasons discussed above, plaintiff's *Fed. R. Civ. P. 60(b)* motion to vacate his "on the record" settlement with defendant is denied and we order Mr. Manning to sign the version of the settlement agreement agreed upon by counsel and [*52] the Court during the April 4, 2001 conference call.

**IT IS SO ORDERED.**

DATED: New York, New York

August 21, 2001

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

1996 U.S. Dist. LEXIS 15424, *

LEXSEE 1996 US DIST LEXIS 15424

**QATAR NATIONAL NAVIGATION & TRANSPORT CO., LTD., Plaintiff, -against- CITIBANK, N.A., Defendant. -against- CITIBANK, N.A., Defendant and Third Party Plaintiff, -against- LEONARD FLOCCO, MARTEC PETROLEUM & ENERGY CORP., SURICO INC., and SANJA SURI, Third-Party Defendants.**

**89 Civ. 464 (CSH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1996 U.S. Dist. LEXIS 15424*

**October 16, 1996, Decided
October 18, 1996, FILED**

**COUNSEL:** [*1] For QATAR NAT'L NAVIGATION TRANSPORT CO., plaintiff: Donald Burke, Cardillo & Corbett, New York, NY.

For CITIBANK, defendant: M. Sullivan, Stuart A. Krause, Zeichner Ellman & Krause, New York, NY. Christopher P. Keane, Keane & Marlowe, New York, NY.

For CITIBANK, third-party plaintiff: M. Sullivan, Zeichner Ellman & Krause, New York, NY.

**JUDGES:** CHARLES S. HAIGHT, JR., UNITED STATES SENIOR DISTRICT JUDGE

**OPINION BY:** CHARLES S. HAIGHT, JR.

**OPINION**

*MEMORANDUM AND ORDER*

*HAIGHT, Senior District Judge:*

As trial of this maritime action approaches, plaintiff has submitted an "errata statement" dated October 11, 1996 and signed by Hassan Mandour, a principal witness for plaintiff. In that errata statement, Mandour undertakes to correct a designation which he made on the capacity plan of the M/T Mabrouk during a deposition which he gave on October 31, 1989. The errata statement also undertakes to make two corrections in a sworn declaration executed by Mandour on September 7, 1993, which was submitted to the Court during prior motion practice in the case.

Defendant objects to the filing of the errata statement as part of the record.

As far as Mandour's deposition is concerned, the

[*2] case is governed by *Rule 30(e), Fed.R.Civ.P.* That rule permits the deponent or a party to request that the deponent be given 30 days to review the transcript and, authorize the deponent, "if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them." Failure of the party or deponent to return the deposition with properly executed changes within 30 days constitutes "a waiver of the right to examine and read the transcript." *Calloway v. Marvel Entertainment Group, 110 F.R.D. 45, 52 (S.D.N.Y. 1986)* (six months delay).

Even if a deponent changes his answers within the time specified by *Rule 30(e)*, the altered answers do not take the place of the original ones. In respect of a party's managing agent, such as Mandour, "his original deposition answers constitute the admissions of a party, and as such form part of the record evidence." *Podell v. Citicorp Diners Club, Inc., 914 F. Supp. 1025, 1034 (S.D.N.Y. 1996).* The party "is then entitled to introduce the amended answer and explain the reasons for the change." *Id.* (citations and internal quotation marks omitted). *Rule 30(e)* allows a deponent to make [*3] changes in his deposition even if the changes contradict the original answers or even if the deponent's reasons for making the changes are unconvincing. *Id.*

While these principles of *Rule 30(e)* are familiar enough, they may not be invoked by plaintiff at bar, since Mandour endorsed his deposition transcripts, recorded in Canada and thereafter in France, as correct. What the attempted deposition alternation really comes down to is that, according to a letter from plaintiff's counsel dated October 16, 1996 at 1-2, Mandour had "an opportunity recently" to discuss the matter with the Mabrouk's pump man, with the result that Mandour's memory was refreshed "and he recalls that No. 5C [tank] was dedicated to fuel oil not gas oil." Plaintiff is entitled to elicit such testimony from Mandour at the trial, where

1996 U.S. Dist. LEXIS 15424, *

the circumstances of his change of testimony may be explored on cross-examination. However, there is no authority to sanction the receipt of a deposition errata statement into the record at this time.

Nor is there authority entitling plaintiff to file an errata statement changing Mandour's prior sworn declaration. That declaration could not in any event be admitted at trial on [*4] plaintiff's case in chief, since it was not subject to cross-examination. Defendant may use the declaration as an admission by a party opponent; and in that context, Mandour may make whatever explanation of the changes that he wishes, again subject to testing by cross-examination. But plaintiff is not entitled to have Mandour alter his declaration prior to trial; and so I decline to receive the errata statement in its entirety.

It is So Ordered.

DATED: New York, New York

October 16, 1996

CHARLES S. HAIGHT, JR.

UNITED STATES SENIOR DISTRICT JUDGE

2004 U.S. Dist. LEXIS 35, *

LEXSEE 2004 US DIST LEXIS 35

**ZENG LIU, et al., Plaintiffs, -against- JEN CHU FASHION CORP., JEN CHU APPAREL INC., W & C FASHION CORP., WONG CHAI SPORTSWEAR INC., Y & C MFG. INC., CALVIN CHEN, WINNIE YOUNG CHEN, JEN JEN OF NEW YORK INC., and H.L.S. FASHION CORP., Defendants.**

**00 Civ. 4221 (RJH) (AJP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 35*

**January 7, 2004, Decided**

**PRIOR HISTORY:** *Zeng Liu v. Donna Karan Int'l, Inc., 207 F. Supp. 2d 191, 2002 U.S. Dist. LEXIS 10542 (S.D.N.Y., 2002)*

**DISPOSITION:** Magistrate recommended that judgment be entered for plaintiffs.

**COUNSEL:** [*1] For Zeng Liu, Miao Chen, Feng Jiang, Hong Huang, Xiao Li, PLAINTIFFS: Adam T Klein, Outten & Golden, New York, NY USA. Kenneth Kimerling, Stanley Mark, Asian American Legal Defense & Education Fund Inc, New York, NY, USA. Scott A Moss, Outten & Golden, New York, NY USA.

For Jen Chu Fashion Corp, Jen Chu Apparel Inc, W & C Fashion Corp, Wong Chai Sportswear Inc, Y & C Mfg Inc, Carvin Chen, Winnie Young Chen, Jen Jen of New York Inc, HLS Fashion Corp, DEFENDANTS: Chi-Yuan Hwang, Chi-Yuan Hwang, Esq, Flushing, NY USA.

**JUDGES:** Andrew J. Peck, United States Magistrate Judge. Honorable Richard J. Holwell, United States District Judge.

**OPINION BY:** Andrew J. Peck

**OPINION**

**REPORT AND RECOMMENDATION**

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Richard J. Holwell, United States District Judge:**

On October 16, 2003, Judge Rakoff (to whom the case was then assigned) entered a default judgment for plaintiffs against defendants Jen Chu Fashion Corp., Jen Chu Apparel, Inc., W & C Fashion Corp., Wong Chai Sportswear, Inc., Y & C Mfg. Inc., Jen Jen of New York Inc., and Calvin Chen (hereafter collectively "the Calvin Chen defendants"). (Dkt. No. 64: 10/16/03 Order.) [1]

> 1   Plaintiffs previously settled with defendant Donna Karan International, Inc. (Dkt. No. 53: 7/30/03 Stip. & Order.)

[*2] Defendants Winnie Young Chen and her company, H.L.S. Fashion Corp. (hereinafter collectively "the Winnie Chen defendants") were represented by John Courtney, Esq., but Mr. Courtney moved to withdraw as counsel. (*See*Dkt. No. 65.) The Court initially denied the motion because Mr. Courtney "lost" his client, *i.e.*, had no means to reach her. (*See* Dkt. Nos. 65 & 68: 10/17/03 & 11/3/03 Orders; *see also* Dkt. No. 71: 11/26/03 Courtney Letter to Court.) Neither Mr. Courtney nor Ms. Chen have responded to plaintiffs' inquest/summary judgment motion. (*See* Dkt. No. 70: 11/13/03 Order.) By memo endorsed Order dated December 22, 2003, the Court granted Mr. Courtney's renewed withdrawal application. (12/22/03 Memo Endorsed Order.) The Court has heard nothing from Winnie Chen. Therefore, judgment against the Winnie Chen defendants should be entered on default.

For the reasons discussed below, the Court should enter judgment for plaintiffs against the Calvin Chen defendants and the Winnie Chen defendants jointly and severally, for damages (including prejudgment interest) of $ 556,577.07, attorneys' fees of $ 20,355, and costs of $ 90.

**FACTS**

"Where, as here, 'the court [*3] determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'" *Chen v. Jenna Lane,*

2004 U.S. Dist. LEXIS 35, *

*Inc., 30 F. Supp. 2d 622, 623 (S.D.N.Y. 1998)* (Carter, D.J. & Peck, M.J.) (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil 3d § 2688* at 58-59 (3d ed. 1998)). [2]

2   *Accord, e.g., Joe Hand Promotions, Inc. v. Soto, 2003 U.S. Dist. LEXIS 22560, 01 Civ. 0329, 2003 WL 22962810 at *1 (S.D.N.Y. Dec. 17, 2003)* (Peck, M.J.); *Pacific Westeel, Inc. v. D&R Installation, 2003 U.S. Dist. LEXIS 18436, 01 Civ. 0293, 2003 WL 22359512 at *1 (S.D.N.Y. Oct. 17, 2003)* (Peck, M.J.); *Med. Econ. Co. v. HealthExchange, Inc., 2003 U.S. Dist. LEXIS 18293, 01 Civ. 11262, 2003 WL 22346391 at *1 (S.D.N.Y. Oct. 15, 2003)* (Peck, M.J.); *Trs of the Elevator Div. Ret. Benefit Plan v. Premier Elevator Co., 2003 U.S. Dist. LEXIS 16110, 03 Civ. 2703, 2003 WL 22127912 at *1 (S.D.N.Y. Sept. 16, 2003)*; *Cablevision Sys. N.Y. City Corp. v. Torres, 2003 U.S. Dist. LEXIS 15524, 02 Civ. 7602, 2003 WL 22078938 at *3 (S.D.N.Y. Sept. 9, 2003)* (Peck, M.J.); *Eastern Freight Ways v. Eastern Motor Freight, 2003 U.S. Dist. LEXIS 11534, 02 Civ. 3138, 2003 WL 21540382 at *1 (S.D.N.Y. July 9, 2003)* (Peck, M.J.), *report & rec. adopted as modified on other grounds, 2003 U.S. Dist. LEXIS 13932, 2003 WL 21921270 (S.D.N.Y. Aug. 11, 2003)*; *Schruefer v. Winthorpe Grant, Inc., 2003 U.S. Dist. LEXIS 11179, 99 Civ. 9365, 2003 WL 21511157 at *1 (S.D.N.Y. July 2, 2003)* (Peck, M.J.); *Joy Lud Distribs. Int'l, Inc. v. Contini, 2003 U.S. Dist. LEXIS 2701, 00 Civ. 5011, 2003 WL 554616 at *1 (S.D.N.Y. Feb. 28, 2003)* (Peck, M.J.); *Rolex Watch U.S.A., Inc. v. Brown, 2002 U.S. Dist. LEXIS 10054, 01 Civ. 9155, 2002 WL 1226863 at *1 (S.D.N.Y. June 5, 2002)* (Peck, M.J.); *King Vision Pay-Per-View Corp. v. Drencia Rest. Corp., 2002 U.S. Dist. LEXIS 8636, 01 Civ. 9777, 2002 WL 1000284 at *1 (S.D.N.Y. May 15, 2002)* (Peck, M.J.); *Ainbinder v. Bernice Mining & Contr. Inc., 2002 U.S. Dist. LEXIS 4910, 01 Civ. 2492, 2002 WL 461576 at *2 (S.D.N.Y. Mar. 26, 2002)* (Peck, M.J.); *Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc., 2002 U.S. Dist. LEXIS 4944, 00 Civ. 7352, 2002 WL 461574 at *3 (S.D.N.Y. Mar. 26, 2002)* (Peck, M.J.); *King Vision Pay-Per-View Corp. v. Papacito Lidia Luncheonette, Inc., 2001 U.S. Dist. LEXIS 19968, 01 Civ. 7575, 2001 WL 1558269 at *1 (S.D.N.Y. Dec. 6, 2001)* (Peck, M.J.); *Trs. of the Pension & Welfare Funds of the Moving Picture Mach. Operators Union, Local 306 v. Gordon's Film & Co. (New York) Int'l Inc., 2001 U.S. Dist. LEXIS 18455, 00 Civ. 8452, 2001 WL 1415145 at *1 (S.D.N.Y. Nov. 13, 2001)* (Peck, M.J.); *Coast To Coast Fabrics, Inc. v. Tracy Evans, Ltd., 2001 U.S. Dist. LEXIS 1, 00 Civ. 4417, 2001 WL 5037 at *1 (S.D.N.Y. Jan. 2, 2001)* (Peck, M.J.); *Starbucks Corp. v. Morgan, 2000 U.S. Dist. LEXIS 14677, 99 Civ. 1404, 2000 WL 949665 at *1 (S.D.N.Y. July 11, 2000)* (Peck, M.J.); *King Vision Pay-Per-View, Ltd. v. New Paradise Rest., 2000 U.S. Dist. LEXIS 8792, 99 Civ. 10020, 2000 WL 378053 at *1 (S.D.N.Y. Apr. 11, 2000)* (Peck, M.J.); *Independent Nat'l Distrib., Inc. v. Black Rain Communications, Inc., 1996 U.S. Dist. LEXIS 22576, 94 Civ. 8464, 1996 WL 238401 at *2 (S.D.N.Y. Apr. 4, 1996)* (Keenan, D.J. & Peck, M.J.).

[*4]  There are twenty-three plaintiffs - five original plaintiffs and eighteen "opt in" plaintiffs pursuant to *29 U.S.C. § 216(b)*. (*See* Dkt. No. 75: Plfs. Inquest Br. at 2 n.1.)

The Amended Complaint (Dkt. No. 5) alleges as follows:

Plaintiffs are Chinese immigrant garment workers who worked long hours for the defendant companies producing expensive garments but were not paid minimum wages or overtime. (Dkt. No. 5: Am. Compl. P 1.) Plaintiffs were paid either by the hour or by the piece. (Am. Compl. P 6.) Plaintiffs worked at a garment factory at 519 Eighth Avenue in New York City that had various corporate owners, all of which were controlled by Calvin Chen and his then-wife Winnie Chen. (Am. Compl. PP 8-14.) Defendants thus were employers and joint employers of plaintiffs under the Fair Labor Standards Act ("FLSA"), *29 U.S.C. § 201 et seq.*, and the New York Labor Law. (Am. Compl. P 16.)

According to the Amended Complaint:

Plaintiffs worked for defendants generally seven days a week. Prior to May 1999, the hourly workers, Liu and Chen, generally worked eleven hours a day during the weekdays and ten and eight hours a day on Saturday [*5] and Sunday. Plaintiff Huang and the piece workers, plaintiffs Jiang and Li, generally worked twelve hours a day during the weekdays and ten and eight hours a day on Saturday and Sunday. They were rarely paid overtime; and when they were, it was for only a few hours and not the 30 to 40 hours of overtime that they generally worked. The piece workers sometimes were unable to earn the minimum wage. None of the plaintiffs ever received spread-of-hours pay - an extra hour's pay for each ten-hour day.

(Am. Compl. P 17.)

2004 U.S. Dist. LEXIS 35, *

Following a New York State Department of Labor visit to the factory, defendants began maintaining two sets of books - one reflecting plaintiffs' actual hours worked and "the other a false record reflecting a workweek with no, or almost no, overtime," and "plaintiffs were required to sign both [time] cards." (Am. Compl. P 37; *see also id.* PP 38-43.)

The Amended Complaint asserts three causes of action: (a) a federal wage claim for defendants' "failure to pay plaintiffs the minimum wage and overtime pay for work over 40 hours per week" (Am. Compl. P 53), (b) a state wage claim for "failure to pay plaintiffs their wages, minimum wages, and overtime pay for work [*6] over 40 hours per week" (Am. Compl. P 55), and (c) a New York spread of hours claim for "failure to pay plaintiffs an extra hour's pay for every day that plaintiffs worked over 10 hours" in violation of New York Labor Law (Am. Compl. P 57). The Amended Complaint seeks, *inter alia,* (i) unpaid wages and liquidated damages pursuant to the FLSA, (ii) unpaid wages including minimum wage, overtime pay and spread of hours pay, plus prejudgment interest, under the New York Labor Law, and (iii) attorneys' fees and costs. (Am. Compl. Wherefore Clause PP a, b & d.)

### EVIDENCE ON THE INQUEST AND ANALYSIS

The Second Circuit has approved the holding of an inquest by affidavit, without an in-person court hearing, "'as long as [the Court has] ensured that there was a basis for the damages specified in the default judgment.'" *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)* (quoting *Fustok v. ContiCommodity Servs., Inc., 873 F.2d [[38, 40 (2d Cir. 1989)).* [3] Here, using affidavits was particularly appropriate because plaintiffs are Chinese-speakers who do not speak English, and the evidence could best be provided [*7] in cumulative chart form. (*See* Dkt. No. 77: Kimerling 12/12/03 Inquest Aff. Exs. A-B.) The Court has reviewed plaintiffs' affidavits and interrogatory responses (Kimerling 12/12/03 Inquest Aff. Ex. B) and counsel's charts and summaries (*id.,* Exs. A, C & E; *see also* Kimerling 12/29/03 Supp. Aff. Exs. AC).

> 3   *Accord, e.g.,* cases cited in fn.1 above; *see also, e.g., Chen v. Jenna Lane, Inc., 30 F. Supp. 2d 622, 624 (S.D.N.Y. 1998)* (Carter, D.J. & Peck, M.J.); *Semi Conductor Materials, Inc. v. Agriculture Inputs Corp.,* 1998 U.S. Dist. LEXIS 22939, 96 Civ. 7902, 1998 WL 388503 at *8 (S.D.N.Y. June 23, 1998) (Kaplan, D.J. & Peck, M.J.).

Plaintiffs' affidavits described: the plaintiff's job positions at the factory owned by Calvin Chen and Winnie Chen; the time period during which plaintiff

worked for defendants; plaintiff's normal work schedule; and plaintiff's rate of pay or wage calculations, based on defendants' records where available, otherwise based on plaintiff's records. (Dkt. [*8] No. 77: Kimerling 12/12/03 Inquest Aff. Exs. A(1)-A(23).) Where available the affidavits also included sample pages from the plaintiff's piecework or other records, but since they are, for the most part, in Chinese, including the complete records would not have assisted the Court.

It should be noted that "plaintiffs were unable to obtain any time records from the defendants," and only obtained from defendants "some wage records for 1999 and 2000 . . . [which] plaintiffs rely on . . . for the time that they cover." (Kimerling 12/12/03 Inquest Aff. PP 5-6.) "For other periods of employment, plaintiffs rely on their own records and/or estimates of their weekly wages . . . [which] are most often based on average wages drawn from the Defendants' records or the plaintiffs' own records." (Kimerling 12/12/03 Inquest Aff. P 6.)

Defendants were served with a copy of plaintiff's inquest papers but did not respond. In a FLSA case, in the absence of rebuttal by defendants, plaintiffs' recollection and estimates of hours worked are presumed to be correct. *See, e.g., Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88, 66 S. Ct. 1187, 1192, 90 L. Ed. 1515 (1946)* [*9]  ("An employee has carried out his burden [of production under the FLSA] if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work by just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."); *Grochowski, v. Phoenix Constr., 318 F.3d 80, 87-88 (2d Cir. 2003); Harold Levinson Assocs., Inc. v. Chao, No. 01-6105, 37 Fed. Appx. 19, 20, 2002 WL 1032708 at *1 (2d Cir. May 22, 2002); Tran v. Alphonse Hotel Corp., 281 F.3d 23, 31 (2d Cir. 2002); Reich v. Southern New England Telecomms. Corp., 121 F.3d 58, 66 (2d Cir. 1997); Moon v. Kwon, 248 F. Supp. 2d 201, 219 (S.D.N.Y. 2002); Chao v. Vidtape, Inc., 196 F. Supp. 2d 281, 293 (E.D.N.Y. 2002),aff'd* [*10]  *as modified on other grounds, Nos. 02-6090, 02-6129, 66 Fed. Appx. 261, 2003 WL 21243085 (2d Cir. May 29, 2003); Guo Xing Cao v. Chandara Corp.,* 2001 U.S. Dist. LEXIS 8631, 00 Civ. 8057, 2001 WL 34366628 at *4-5 (S.D.N.Y. July 25, 2001); *Chen v. Jenna Lane, Inc., 30 F. Supp. 2d 622, 624-25 (S.D.N.Y. 1998)* (Carter, D.J. & Peck, M.J.). Here, plaintiffs' hours worked were derived from their contemporaneous piecework and other records. The Court accepts plaintiffs' estimates of hours worked.

Consistent with the approach previously used by Mr. Kimerling and approved by the Court in *Chen v. Jenna Lane, Inc., 30 F. Supp. 2d at 625*, Mr. Kimerling described the methodology he employed to determine minimum wage payment, overtime and spread of hours pay for plaintiffs, as follows:

### MINIMUM WAGE

12. To determine whether Plaintiffs were paid the minimum wage, the charts calculate the minimum wages based [on] what was the appropriate hourly rates at the time of the work. The minimum wage requirements were different under the federal Fair Labor Standards Act and under the New York State Labor Law during the periods covered by this lawsuit. Because the nonpayment [*11] of minimum wage and overtime were intentional and willful acts, a three year statute of limitations applies under FLSA. *29 U.S.C. § 255(a)*. For the three years prior to the date the complaint was filed, June 7, 2000, the FLSA rates were used. As of September 1, 1997, the FLSA rate of $ 5.15 applied. *29 U.S.C. § 206(a)*. Prior to that, a rate of $ 4.75 applied. *Id*. For the Plaintiffs that opted into the case, their opt-in dates became the starting point for statute of limitation purposes. As stated above, the opt-in dates of the opt-in plaintiffs, as well as the date of the filing of the Complaint for the original plaintiffs, are attached in Exhibit E.

13. Under the New York State Labor Law, the minimum wage for the period prior to June 7, 1997 (three years before the filing of the Complaint) was $ 4.25 and [sic; an] hour. *N.Y. Lab. § 652*. New York's minimum wage did not change until March 31, 2000 when it went up to $ 5.15. Thus, for all the plaintiffs the New York State minimum wage claims are based on a rate of $ 5.15 and [sic; an] hour. [4]

14. Plaintiffs' actual weeklyearnings were compared to the appropriate minimum wage weekly [*12] earnings. If a plaintiffs' earnings were below the minimum wage, the amount owed was inserted in the column called Minimum Wage (MW) Owed.

15. For those plaintiffs who were paid by the hour at a rate above the minimum wage, this analysis was not done.

### OVERTIME

16. Plaintiffs almost always worked overtime - more than 40 hours a week. However, they were not paid for their overtime. The damage charts calculate what they should have earned in overtime pay using their average hourly rate earned in a week (the "regular rate") or the minimum wage, which ever is larger. The amounts overtime pay owed was placed in the Overtime (OT) Owed column.

### SPREAD OF HOUR'S PAY

17. Plaintiffs are entitled to an extra hour's pay, at the minimum wage under New York Labor Law, for every day they are on the job more than 10 hours. To calculate the amount owed, the damage charts did two things. For some plaintiffs, their total weekly work hours were known because they kept their own hours, or because they were paid by the hour, and thus their hours could be calculated based on their reported wages. For these plaintiffs, all of whom generally worked at least 6 days a week, where their hours were 60 or more [*13] including lunch time, they were considered to be entitled to 6 days of spread hours pay. If their total hours were between 53 and 60 hours, they were determined to be entitled to 5 days of spread hours pay. If their total hours were below 53 hours, it was impossible to estimate how many days, if any, were more than 10 hours. For these weeks, no days were determined to [be] entitled to spread of hours pay. This conservative consideration of these 53 hours weeks was done to offset any overestimation that may have occurred in other weeks.

18. Other plaintiffs did not have their own records but provided counsel with their recollections of their regular work hours, i.e., start and leaving times, and their work weeks, i.e., how many seven-day weeks. Using this information, spread-of-hour calculations were done.

19. The New York State minimum wage rate of $ 4.25 was used in these spread-of-hours calculations for all days prior to March 31, 2000, after which the rate of $ 5.15 was used. NY Lab. *§ 652*.

### LIQUIDATED DAMAGES

20. Plaintiffs are entitled to liquidated damages for the willful and intentional acts of defendants. There is no excuse for not paying the minimum wages and overtime [*14] wages to manual laborers like plaintiffs. The Defendants must have acted willfully and intentionally.

21. At the bottom of Plaintiffs' damage charts, the federal and New York State liquidated damages are calculated. The federal FLSA's liquidated damages, 100%, are calculated for the first three years of the overtime and minimum wage violations, i.e., for the first three years before the filing date or opt-in date. The New York State liquidated damages, 25%, are calculated for the overtime and minimum wage violations that occurred in the period of time between six years and three years before the filing date or opt-in date. The spread-of-hours damages are subject to New York State's liquidated damages for the total period covered in the damage charts.

(Dkt. No. 77: Kimerling 12/12/03 Inquest Aff. PP 12-21.)

4   Mr. Kimerling's statement is incorrect: The minimum wage claim is based on $ 5.15 where the federal and state limitations periods overlap, i.e., for September 1997 forward; for the period prior to June 1997, the state rate of $ 4.25 was used; and for the period between June 7, 19967 and August 31, 1997, the federal rate of $ 4.75 was used. The Court verified this through the calculations on plaintiffs' charts, Kimerling 12/12/03 Inquest Aff. Ex. A. Thus, the affidavit description is incorrect but the charts were correctly done.

[*15]   As noted, the above methodology was approved by this Court previously in *Chen v. Jenna Lane, Inc.*, 30 F. Supp. 2d at 625, and the Court again approves it here. The Court has reviewed the affidavits and the charts derived therefrom (Kimerling 12/12/03 Inquest Aff. Exs. B & A, respectively) and has "spot checked" the arithmetic calculations in the charts.

Plaintiffs' original inquest submissions, however, did not reflect the fact that plaintiffs had settled with former defendant Donna Karan. By Order dated December 18, 2003, the Court directed plaintiffs' counsel to address this issue. (12/18/03 Order.) The matter was further discussed at a December 22, 2003 conference before the Court, attended by plaintiffs' counsel and counsel for Donna

Karan. (*See* 12/22/03 Conf. Tr.) As a result, plaintiffs' counsel Mr. Kimerling submitted a supplemental affidavit showing how much each plaintiff had received in the Donna Karan settlement, and deducting that from the amount of damages (including federal and state liquidated damages) sought by each plaintiff. (Kimerling 12/29/03 Supp. Aff. PP 2-3, 5 & Exs. A-C.)

Plaintiffs also seek prejudgment interest on their state law claims [*16] pursuant to C.P.L.R. *§ 5001*. (Dkt. No. 75: Plfs. Inquest Br. at 10.) The Second Circuit has held that even where a plaintiff is awarded liquidated damages under the New York Labor Law, prejudgment interest still is appropriate. *Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 265 (2d Cir. 1999), cert denied, 528 U.S. 1119, 120 S. Ct. 940, 145 L. Ed. 2d 818 (2000); *Keun-Jae Moon v. Joon Gab Kwon*, 99 Civ. 11810, 2002 U.S. Dist. LEXIS 22959 at *2 (S.D.N.Y. Oct. 30, 2002) (awarding liquidated damages and prejudgment interest for violations of FLSA and New York Labor Law). The statutory interest rate in New York is 9%. C.P.L.R. *§ 5004*. Because the unpaid wages to each plaintiff occurred at different times, interest is to be calculated pursuant to C.P.L.R. *§ 5001(b)* ("Where . . . damages were incurred at various times, interest shall be computed upon each time from the date it was incurred or upon all of the damages from a single reasonable intermediate date."); *see also, e.g., Reilly v. Natwest Mkts. Group Inc., 181 F.3d at 265*. Plaintiffs' counsel used the "midpoint of the accrual of damages" for each plaintiff to calculate [*17] interest. (Kimerling 12/29/03 Supp. Aff. PP 7-8 & Ex. B.) The Court finds acceptable the methodology used by plaintiffs' counsel to compute interest. (Kimerling 12/29/03 Supp. Aff. PP 7-8 & Ex. B.) ⁵

5   The Court notes that Mr. Kimerling's calculations used an assumption favorable to plaintiff - he attributed the Donna Karan settlement payments first to federal damages and then to the liquidated damage amounts under New York Labor Law. (Kimerling 12/29/03 Supp. Aff. P 5.) Those categories are not entitled to prejudgment interest, which applies only to plaintiffs' state wage claims. While this methodology is favorable to plaintiffs, defendants have defaulted and not submitted any alternative methodology and the Court therefore accepts plaintiffs' methodology for allocating the Donna Karan settlement amounts and calculating interest.

Accordingly, plaintiffs are entitled to judgment for the following damage amounts, including federal and state liquidated damages and interest on the state wage claims: [*18]

2004 U.S. Dist. LEXIS 35, *

| Plaintiff | Amount |
|---|---|
| Cai, Rui Yu | $ 2,643.53 |
| Cao, Ke Xiu | 39,233.72 |
| Cao, Yao Chai | 29,932.63 |
| Chan, Lai Yee | 23,952.28 |
| Chen, Bi Fang | 33,950.82 |
| Chen, Jin Sen | 52,152.58 |
| Chen, Miao Qiong | 1,714.76 |
| Chen, Sheng Jian | 27,718.42 |
| Chen, Shu Hui | 26,804.74 |
| Chen, Yi Qing | 20,708.62 |
| Huang, Hong Biao | 11,629.74 |
| Jian, Feng Ying | 29,272.14 |
| Li, Xiao Dian | 23,969.30 |
| Lin, Jin Shun | 62,436.75 |
| Lin, Xiu Feng | 26,741.95 |
| Liu, Hui Qin | 22,568.80 |
| Liu, Zeng Guan | 636.06 |
| Peng, Yue Ming | 8,254.46 |
| Shi, Ke Yue | 37,139.99 |
| Wang, Qi Kai | 13,834.76 |
| Wang, Tang Qing | 11,087.30 |
| Xue, Bao Yu | 20,020.50 |
| Zou, Jian Qin | 30,173.22 |
|  | $556,577.07 |

(Dkt. No. 77: Kimerling 12/12/03 Inquest Aff. Exs. A1-A23; Kimerling 12/29/03 Supp. Aff. Exs. B-C.)

Under both the FLSA and New York Labor Law, both Calvin Chen and Winnie Chen are considered employers and thus are individually liable for these damages. (*See* Dkt. No. 75: Plfs. Inquest Br. at 8-10.) *29 U.S.C. § 203(d)*; *N.Y. Labor Law §§ 2(5)-(6)*; *see, e.g., Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139-40 (2d Cir. 1999)*; *Chung v. New Silver Palace Rest., Inc., 272 F. Supp. 2d 314, 318* & n.6 (S.D.N.Y. 2003) [*19] (test for employee under New York Labor Law is same as *Herman* test under FLSA).

### Attorneys' Fees

The FLSA provides for attorneys' fees and costs to a successful plaintiff. *29 U.S.C. § 216(b)*; *see also, e.g., Chen v. Jenna Lane, Inc., 30 F. Supp. 2d 622, 625 (S.D.N.Y. 1998)* (Carter, D.J. & Peck, M.J.).

Plaintiffs request $ 20,355 in attorneys' fees and $ 90 in costs. (*See* Dkt. No. 76: Kimerling 12/12/03 Fee Aff. P 15.) The Court finds Mr. Kimerling's hourly rate of $ 350 (*id.* PP 5-11) to be reasonable. [6] Mr. Kimerling has taken a conservative approach to the hours requested, claiming

reimbursement only for the hours billed *after* the plaintiffs' settlement with Donna Karan. (*See id.* P 3.) The Court has reviewed Mr. Kimerling's hourly time entries and finds them reasonable. (*See id.* PP 2-4 & Ex. A.) The $ 90 cost for a court transcript is reasonable.

> 6   The Court approved his then-hourly rate of $ 300 in 1998 in *Chen v. Jenna Lane, Inc., 30 F. Supp. 2d at 625.*

[*20]   Accordingly, plaintiffs are entitled to attorneys' fees of $ 20,355 ($ 350 times 58.1 hours) and costs of $ 90.

### CONCLUSION

For the reasons set forth above, the Court should enter judgment for plaintiffs against the Calvin Chen defendants and the Winnie Chen defendants, jointly and severally, for damages (including prejudgment interest) of $ 556,577.07, plus $ 20,355 in attorneys' fees and $ 90 in costs.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to *28 U.S.C. § 636(b)(1)* and *Rule 72(b) of*

2004 U.S. Dist. LEXIS 35, *

*the Federal Rules of Civil Procedure*, the parties shall have ten (10) days from service of this Report to file written objections. *See also Fed. R. Civ. P. 6.* Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Holwell, 500 Pearl Street, Room 1950, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Holwell. Failure to file objections will result in a [*21]  waiver of those objections for purposes of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.),* *cert. denied, 506 U.S. 1038, 113 S. Ct. 825, 121 L. Ed. 2d 696 (1992); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).*

DATED: New York, New York

January 7, 2004

Respectfully submitted,

**Andrew J. Peck**

United States Magistrate Judge